Tyrone **BROOKS**, et al., Plaintiffs,

v.

**STATE BOARD OF ELECTIONS,**
et al., Defendants,

and

Donald **Cheeks**, et al., Intervenors.

Civ. A. No. CV288–146.

United States District Court,
S.D. Georgia,
Brunswick Division.

March 7, 1994.

Laughlin McDonald, Kathleen L. Wilde, Neil Bradley, ACLU, Atlanta, GA, J. Gerald Hebert, Dept. of Justice, Civil Rights Div., Washington, DC, for plaintiffs and counter-defendants.

Stanley Curtis House, Charles Leslie Wilkinson, III, Augusta, GA, for intervenors-plaintiffs and cross-claimants.

William Jacob Cobb, David Frank Walbert, Walbert & Herman, Carol Atha Cosgrove, Atlanta, GA, for defendants.

Edmund Booth, pro se.

Donna M. Murphy, Dept. of Justice, Civil Rights Div., Voting Section, Washington, DC, for U.S.

Thomas R. Burnside, Jr., pro se.

J. Taylor Phillips, pro se.

Harold A. Johnson, pro se.

A.C. Guhl, pro se.

Walter C. McMillan, Jr., pro se.

Harold D. McLendon, pro se.

Verna L. Smith, pro se.

Warren McLendon, pro se.

I.G. Dawson, Sr., pro se.

Harold Alexander, Atlanta, GA, for Emma L. Adams.

Diane Marie Morrell, Allen & Perry, Savannah, GA, Randal A. Mangham, Atlanta,

GA, for Georgia Alliance of African–American Attys.

Harold Alexander, pro se.

Randal Mangham, pro se.

David Frank Walbert, Walbert & Herman, Atlanta, GA, for cross-defendants.

## ORDER

EDENFIELD, Chief Judge.

Currently before the Court are the joint motion of the Defendants and the Plaintiffs for approval of their proposed settlement agreement and a motion by the Intervenors for summary judgment. For the reasons stated herein, both motions are **DENIED**.

### Background

Plaintiffs filed this action in 1988 challenging several aspects of the Georgia judicial system under the United States Constitution and the Voting Rights Act of 1965 ("VRA"). Specifically, the Plaintiffs challenge the manner in which judges of the state court, superior court and court of appeals and justices of the supreme court are elected in Georgia under Section 2 of the VRA and the legality of certain changes made to the Georgia judicial system since the enactment of Section 5 of the VRA. Pursuant to Section 5 of the VRA, Pub.L. 89–110, Title I, § 5, 79 Stat. 437 (codified as amended at 42 U.S.C. § 1973c (1988)), a three-judge panel[1] was convened. In December 1989, the Panel held that Section 5 applied to judicial elections, that the Georgia electoral scheme has the *potential* for discriminating against minority voters, and that the State of Georgia failed to obtain preclearance for numerous changes to their electoral scheme as required by the VRA. *Brooks v. State Bd. of Elections,* 775 F.Supp. 1470 (S.D.Ga.1989), *modified on other grounds,* 775 F.Supp. 1490 (S.D.Ga.1991), and *aff'd,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990) (*Brooks I* ). Consequently, the Court enjoined the State from filling judicial positions that had not been precleared. *Id.* at 1484. Incumbents, however, were allowed to remain in office. *Id.;* in-

junction extended by *Brooks v. State Bd. of Elections,* 775 F.Supp. 1490, 1491 (S.D.Ga. 1991); *Brooks v. State Bd. of Elections,* 790 F.Supp. 1156, 1159 (S.D.Ga.1992). By Order dated February 28, 1994, this injunction was extended until March 1, 1995.

In June of 1992, after extensive negotiations spanning the course of two years and under the leadership of Senior Federal District Court Judge Anthony A. Alaimo, the Plaintiffs and the Defendants reached a proposed settlement agreement. This agreement, presented to the Court in the form of a consent decree, provides, *inter alia,* that: (1) the Governor will hereafter appoint all judges in Georgia; (2) appointed judges will thereafter be subject only to retention elections; (3) by the end of 1994 there will be at least twenty-five black superior court judges and five additional blacks will be appointed to either the state court or the superior court; (4) in order to realize these numerical requirements, a new category of judgeships, "State Assignment Superior Court Judgeships" may be created and filled by black candidates to serve by assignment in any of the State's judicial circuits; and (5) any disputes that arise under this system in the future will be overseen by Senior District Judge Anthony A. Alaimo. (Consent Decree at 10–14.) The Plaintiffs and the Defendants (collectively referred to herein as the Proponents) signed this consent decree with the understanding that it would not become effective until it was approved by the Department of Justice and the Court.

On September 25, 1992, the Panel granted a motion for the Intervenors to enter this litigation. The Intervenors, along with amicus curiae Thomas Burnside, argue that the terms of the proposed settlement violate their state and federal constitutional rights. On August 30, 1993, the U.S. Attorney General approved the settlement (pre-cleared the changes to the Georgia judicial electoral system contained in the consent decree), conditioned upon approval by this Court, and based on assurances by the Georgia Attorney

---

1. The three-judge panel consisted of Judge Phyllis A. Kravitch of the United States Court of Appeals for the Eleventh Circuit, Judge Dudley H. Bowen, Jr. of the United States District Court for the Southern District of Georgia, and Chief Judge B. Avant Edenfield of the United States District Court for the Southern District of Georgia.

General that the terms of the plan do not violate the Georgia Constitution.[2]

In November of 1993, the Panel denied a motion to allow interim gubernatorial appointments to certain judicial posts pending a final decision by the Court on the proposed settlement agreement. In that Order, the Panel also severed the Section 5 and Section 2 portions of this case, retaining control over the Section 5 claim and directed that the Section 2 claim be addressed by this Court alone. By the authority of that order, this Court must now decide whether or not to approve the proposed settlement agreement.

On November 22, 1993, this Court certified the Plaintiff Class as all present and future black registered voters in Georgia and ordered that notice be given to absent class members pursuant to Rule 23(e). A fairness hearing was held January 12, 1994, at which the Court heard evidence and argument from the Plaintiff Class Representatives, the Defendants, the Intervenors, amicus curiae Thomas Burnside, and several objectors, acting in both their individual and representational capacities.[3] It is important to note that this hearing was not a trial of the merits of this case. Nevertheless, the hearing provided an opportunity for interested parties to make their positions on the proposed settlement agreement known to the Court. After hearing this evidence and testimony, the Court is convinced that all points of view regarding the proposed settlement agreement have been represented and expressed to the Court.

## Analysis

### I. The Court's Role

#### A. Generally

■ Rule 23(e) of the Federal Rules of Civil Procedure provides that "[a] class ac-

tion shall not be dismissed or compromised without the approval of the court." FED. R.CIV.P. 23(e). This rule is designed to ensure that class actions are not settled or compromised to the undue detriment of others, normally absent members of the plaintiff class, who will be affected by the terms of the compromise. In this case, the proposed settlement would affect not only members of the Plaintiff Class, but all persons in the State of Georgia. Thus, in addition to imposing an obligation on the Court to protect the interests of absent class members, Rule 23(e) requires the Court to protect the interests of all persons who would be affected by this settlement agreement and who are not adequately represented by the Parties to this litigation.

In evaluating a proposed settlement agreement in a class action, a court must examine the totality of the circumstances and must determine, under that broad inquiry, whether the proposed settlement is fair, adequate, reasonable, and legal.[4] *E.g., Bennett v. Behring Corp.,* 737 F.2d 982 (11th Cir.1984); *United States v. Marengo County Comm'n.,* 731 F.2d 1546 (11th Cir.1984) *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311; *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1337 (5th Cir.1981); *United States v. City of Alexandria,* 614 F.2d 1358 (5th Cir.1980); *Wainwright v. Kraftco Corp.,* 58 F.R.D. 9 (N.D.Ga.1973). The Proponents bear the burden of persuading the Court of the fairness, adequateness, reasonableness and legality of the agreement's terms.

The courts have formulated a host of factors to be considered in evaluating a proposed settlement in a class action, but several of the factors are geared toward cases in which monetary damages are sought from

---

**2.** The U.S. Attorney General expressed concern, however, that certain provisions of the plan were potentially contrary to *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Remarkably, the Attorney General approved the plan without legal analysis to satisfy this concern. A plan that may violate the Constitution should not be pre-cleared.

**3.** Some of the objectors represented the Georgia Alliance of African–American Attorneys ("GAAAA"). GAAAA had moved to intervene in

this action shortly before the fairness hearing. The Court denied that motion as the Court determined that GAAAA's interests were adequately represented by the Intervenors already present in the case. The Court did, however, invite GAAAA to submit briefs and to participate in the fairness hearing.

**4.** The plan has been presented to the Court as an inseverable unit. The Court, therefore, may only approve it as a whole or reject it as a whole.

private enterprise and are thus inapplicable to this case. Those most relevant to a case like this are: (1) the circumstances surrounding the settlement; (2) the complexity, expense, possible duration, and present stage of the litigation; (3) the reaction to the settlement proposal; (4) the strength of the plaintiffs' case; and (5) the reasonableness of the settlement proposal relative to the law and to the strength of the plaintiffs' case. *See, In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357, 1367 (N.D.Ga.1979) *rev'd in part on other grounds,* 645 F.2d 488 (5th Cir.1981) (citing *Miller v. Republic Nat'l Life Ins. Co.,* 559 F.2d 426 (5th Cir.1977); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2nd Cir.1974); *see also, Bennett,* 737 F.2d at 896 (citations omitted).

In considering these factors, the Court must strike a balance between its need for sufficient information upon which to evaluate the proposed settlement and the limitations on its fact-finding abilities. The "trial court must not reach any dispositive conclusions on unsettled legal [or factual] issues, but at the same time must 'attempt to arrive at some evaluation of points of law [and undisputed points of fact] on which settlement is based.'" *Wainwright v. Kraftco Corp.,* 58 F.R.D. 9 (N.D.Ga.1973) (quoting *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1086 (2nd Cir.1971) *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115).

### B. Difficulties

The standard under which the Court is to evaluate the proposed settlement is deceptive in its simplicity and clarity. In reality, this case is amazingly vexing, chocked full of analytical pitfalls. One of the primary difficulties in this case is developing an analytical framework that does not force the cart to lead the horse. This difficulty arises from the inherently circular character of the issues presented and the curious position in which they place the Court.

The evaluation required for this case involves many highly interrelated factors that cannot be easily defined without reference to other factors. Consequently, the Court is left with the difficult task of analyzing a complex series of issues that has no logical starting point or ending point.

Furthermore, this case leaves the Court in a judicial quandary, torn between a preference for settlement over litigation and the obligations imposed by Rule 23(e). The Court normally prefers settlement over litigation for the simple reason that it is almost always in everyone's best interest for parties to resolve their differences without resorting to the Court. This general principle remains true in class actions, subject to the requirements of Rule 23(e).

The Court's preference for settlement, however, is mitigated in this case by several realities including the importance of the issues involved, the far-reaching effects of the proposed settlement agreement, the less than unanimous approval regarding the agreement, the unique posture and function of the Court relative to this litigation, and the disputed factual record. The proposed settlement would undeniably alter the right of the people of the State of Georgia to vote for their judicial officers. The right to vote being one of the most fundamental and important rights in a free society, the Court must ensure that any alteration of that right is accomplished through legal and proper means.

Moreover, while this proposed settlement takes the form of a consent decree, consent is not unopposed. The Proponents recommend this settlement as the best compromise to a difficult set of circumstances; however, the Intervenors and Objectors (collectively referred to as the Opponents) vehemently oppose it as violative of one of their most sacred and fundamental rights—the right to vote. The Court must, therefore, take this consent decree in the context that it is presented—a contested proposed resolution to a very difficult and important case.

▇▇▇ Notably, the Proponents have not presented the terms of this consent decree to the State legislature or to the people for approval, but rather they seek to invoke the injunctive and coercive power of the federal court to give effect to their agreement.[5] En-

---

5. There was evidence presented at the fairness

hearing to indicate that changes to the Georgia

try of a consent decree is not merely an agreement between litigants, it is a "judicial act" that requires the Court to exercise equitable discretion. *League of United Latin American Citizens v. Clements* ("LULAC"), 999 F.2d 831, 845–46 (5th Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994) (citing *United States v. Swift & Co.,* 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *Kaspar Wire Works, Inc., v. Leco Eng'g & Mach., Inc.,* 575 F.2d 530, 538–39 (5th Cir.1978); 1B JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.409[5] ). Furthermore, since a consent decree potentially involves the Court's power to sanction and enforce, the court "must not merely sign on the line provided by the parties," *United States v. City of Miami,* 664 F.2d 435, 440 (5th Cir.1981) (*en banc* ), but must instead exercise its equitable powers with caution. Accordingly, the Court must not blindly defer to the consenting parties and approve this consent decree, but must remain keenly aware of its responsibilities in evaluating this case.

The Court's analysis is made more difficult by the lack of an unconditional factual record. Indeed, there has been no trial of the merits of this case and the Defendants have not admitted liability under Section 2. Furthermore, the Proponents' stipulations are not absolute—several contain disputed facts, others present facts in a form that is difficult for the Court to utilize [6], and all are expressly limited in their application.[7] The lack of an undisputed factual record makes analysis in this case more difficult.

judicial electoral system have been proposed in the legislature, but that these proposals have failed in committee, without ever reaching the floor of the General Assembly. However, it is undisputed that neither the particular changes at issue, nor the complete plan as set forth in the consent decree, have ever been presented for legislative consideration.

**6.** This case challenges state-wide election practices, but the facts are largely presented in a county-by-county or circuit-by-circuit format. Each county and each circuit has a distinct voting history with distinct facts that are relevant to the Section 2 evaluation. It is difficult, if possible at all, to generalize from county- and circuit-specific facts to the State as a whole.

The Court, therefore, must decide between its preference for settlement and its obligation under Rule 23(e) to protect the interests of those opposed to this settlement. This case has no singular hinge. It ultimately depends on the interaction of many parts and the considered judgment of this Court. In evaluating this case, the Court must consider five factors: (1) the circumstances surrounding the settlement; (2) the complexity, expense, possible duration, and present stage of the litigation; (3) the reaction to the settlement proposal; (4) the strength of the plaintiffs' case; and (5) the reasonableness of the settlement proposal relative to the law and to the strength of the plaintiffs' case.

## II. The Circumstances Surrounding Settlement

The circumstances surrounding settlement do not pose a problem for the approval of the consent decree. In this analysis, the Court inquires into the circumstances surrounding the settlement to determine "whether the settlement negotiations were conducted in an adversarial or collusive manner." *In re Armored Car Antitrust Litigation,* 472 F.Supp. at 1368.

There is no evidence of collusion of any kind in this case. The Proponents underwent a long and arduous process of negotiation in reaching this compromise. In January and February of 1990, and again in April of 1991, numerous meetings were held between the Parties to discuss settlement possibilities. In April of 1992, settlement discussions were again convened under the leadership of Senior Federal District Court

**7.** The Proponents' stipulations reserve all rights in the event of a judicial determination regarding Section 2 liability:

Were either this case, or [other related cases] to proceed to trial, one or more parties might object to admission of fact or document encompassed by these stipulations on the grounds of relevancy, immateriality, or otherwise. In submitting these stipulations, it is the intent of the stipulating parties to fully preserve, and not to waive, any objections that might otherwise be available to the introduction of these matters at the trial of any of these three cases.

(Pls.' and Defs.' Stipulations at 1.)

Judge Anthony A. Alaimo. Despite tremendous effort, it was not until June 17, 1992, that the Proponents reached agreement on the terms of this proposed settlement. All parties to these negotiations acted in good faith and should be commended on their persistence, dedication and attention to detail. This settlement agreement, therefore, does not appear to be the product of collusion and the circumstances surrounding the reaching of this agreement do not pose a problem to Court approval.

### III. The Complexity, Expense, Possible Duration of the Case, and The Present Stage of The Litigation

The complexity, expense, duration, and stage of this litigation do not favor the approval of the consent decree. This case has been and continues to be truly vexing for the Parties, the citizens, the voters, and the Court. The issues presented are complex, the analysis has been long and laborious, and the expense of litigation to date has reached into the hundreds of thousands of dollars. Complexity, expense and long duration normally weigh in favor of the approval of a settlement. However, in this case, most of the complex issues have already been addressed, a large percentage of the total cost that will be associated with this case has already been spent, and the suffering associated with long duration has already been endured. Discovery is complete, a plaintiff class has been certified, the evidence has been largely compiled, and the case is all but ready to proceed to trial. Little time, work, or expense would be saved as a result of a settlement at this late stage. Hence, while the complexity, expense, and potential duration of this case would normally weigh in favor of approval of the proposed settlement agreement, the late stage of this litigation reduces the significance of those factors.

### IV. The Reaction To The Settlement Proposal

The attitude of the people affected by a settlement should be taken into consideration in evaluating the fairness of a proposed settlement. *See, Piambino v. Bailey*, 610 F.2d 1306 (5th Cir.1980) *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469; *Hill v. Art Rice Realty Co.*, 66 F.R.D. 449 (N.D.Ala.1974) *aff'd without opinion*, 511 F.2d 1400 (5th Cir.1975). It is not necessary for all members of a plaintiff class to approve a proposed settlement. Indeed, a court may approve a settlement even if a considerable number of members of the plaintiff class disapprove of it. *See, Bennett*, 737 F.2d at 988. Even so, the number of objectors and the nature of their objections are relevant factors for the Court to consider in evaluating the proposed settlement.

The Proponents negotiated and signed the proposed settlement agreement and obviously approve of its content. At the fairness hearing, the Proponents represented to the Court that the vast majority of the Plaintiff Class approved of this settlement. Class Representative Tyrone Brooks provided the Court with copies of letters of endorsement by many black community leaders and testified to the general approval of the settlement by members of the Plaintiff Class. Several other witnesses corroborated that testimony.

The Intervenors oppose this settlement agreement on the grounds that it violates both Georgia statutory law and Georgia and federal constitutional law. Moreover, they contend that the Proponents lack the requisite legal authority to settle this case in the manner set forth in the consent decree. In their briefs, the Intervenors urged that because this settlement would affect all Georgia voters, the Court should consider, in addition to objections by members of the Plaintiff Class, any objections by Georgia voters who are not members of the Plaintiff Class. The Court agreed and the Court has received hundreds if not thousands of such objections. The crux of most of these objections is that the proposed settlement violates Georgia voters' statutory and constitutional right to elect judges of their choice via contested elections. (*E.g.*, Objection of Jane Streeter (filed January 13, 1994)).

At the fairness hearing, the Georgia Alliance of African American Attorneys ("GAAAA"), a newly enacted state-wide black bar association represented by HJA Alexander, Michael Harvey and Randal Mangham, challenged the Plaintiffs' conten-

tion that there is widespread approval of the settlement agreement. For instance, Mr. Alexander presented to the Court through the cross-examination of Representative Brooks that the voted position of the GAAAA was in opposition to the settlement agreement (Transcript at 57), that the letter of endorsement from the Gate City Bar Association did not represent the voted position of that organization (*Id.* at 58–59), that the DeKalb Lawyers Association presently oppose the settlement (*Id.* at 60), and that the endorsement of the Concerned Black Clergy may have been based on misunderstanding (*Id.* at 62). These representations were not rebutted and they raise serious questions about the approval of the terms of settlement by the members of the Plaintiff Class.

Since the fairness hearing, the GAAAA has filed an objection on behalf of the organization as a whole (filed January 3, 1994) and another objection on behalf of at least one thousand members of the Plaintiff Class (filed January 26, 1994). Generally, these objections contend that the consent decree abrogates the right of Georgia voters to elect judges of their choice through contested elections, a right guaranteed by Georgia law and United States Constitution, and that the consent decree violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by establishing impermissible quotas and second class judges.[8] The Court has also received objections from individual members of the Plaintiff Class. These objections mirror the concerns and arguments contained in the objections of the GAAAA. The Court concludes that the number and nature of objections filed in this case, while not dispositive in either direction, demonstrate that there exists significant opposition to this settlement agreement.

In addition to considering the views of people affected by the settlement, the Court should consider and give some weight to the views of counsel. *Hill*, 66 F.R.D. 449. The Court has been fortunate to work with some of the most experienced voting rights attor-

neys in the country. Few lawyers, if any, have the experience in the voting rights field as Plaintiffs' attorneys Laughlin McDonald and Kathleen L. Wilde. Mr. McDonald is the Director of the Southern Regional Office of the ACLU and has litigated many voting rights cases since 1972. Ms. Wilde is a civil rights attorney with fourteen years of experience, eight of which include voting rights litigation. Both of these distinguished attorneys recommend this settlement to the Court.

The Defendants have been represented throughout this litigation by Attorney General Michael Bowers and David Walbert. Mr. Bowers has extensive litigation experience in general and in the voting rights area. Although vehemently denying that the current system violates the Voting Rights Act and obviously concerned about the constitutional validity of the various provisions of the agreement, Mr. Bowers recommends this settlement to the Court. Mr. Walbert, an attorney with over twenty years of legal experience and significant experience in the voting rights field also recommends this settlement.

In the other corner, Thomas Burnside, a highly respected attorney and amicus curiae in this case, strongly opposes the settlement as violative of the Georgia and Federal Constitutions. Additionally, Stanley House and Charles Wilkinson, attorneys for the Intervenors, vigorously oppose the settlement on the same grounds. Finally, Randal Mangham, HJA Alexander, and Michael Harvey, representatives of the GAAAA and individual members of the Plaintiff Class, oppose the settlement as a disenfranchisement of minority voters and as an inadequate remedy to the problems they perceive with the current Georgia judicial electoral system. The weight of experience weighs in favor of this settlement, but that in itself is not overly persuasive or surprising. All of the attorneys who recommend this settlement represent the Parties who negotiated this agreement. Hence, the Court finds that counsel

---

**8.** Specifically, these objections contend that state assignment superior court judges would be second class judges because they would not share the same power, procedure for assignment of cases, or pay structure as regular superior court judges.

recommendations in this case are not particularly helpful.

## V. The Strength of The Plaintiffs' Case

■ The Court cannot conclude, based on the unsettled state of the law and the disputed facts in the record, whether the Plaintiffs would be any more likely to win than they would be to lose if this case proceeded to trial. One of the most important factors for a court to consider in evaluating a proposed settlement under Rule 23(e) is the strength of the plaintiffs' case—the probability that the plaintiffs would succeed if the case were litigated to a conclusion. *See, Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567 (5th Cir.1960); *Parker v. Anderson,* 667 F.2d 1204 (5th Cir.1982) *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65.

The court must make this valuation determination, however, without the benefit of trial. Thus, the court must be careful not to overstep its bounds. "The trial court must not reach any dispositive conclusions on unsettled legal [or factual] issues, but at the same time must 'attempt to arrive at some evaluation of points of law [and undisputed points of fact] on which settlement is based.' " *Wainwright,* 58 F.R.D. at 11 (quoting *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1086 (2nd Cir.1971)). In evaluating the merits of the Plaintiff's case, the Court must consider the current Georgia judicial electoral system and the legal principles and factual assertions underlying the Plaintiffs' case.

### A. The Present System

The Constitution of the State of Georgia, and various statutes promulgated thereunder, provide for a system whereby judges of the state court, superior court and court of appeals and justices of the supreme court are elected in nonpartisan open elections.[9] GA. CONST. Art. 6, § 7, ¶ 1 (1983).[10] "Each supe-

rior court judge shall be elected by the electors of the judicial circuit in which the judge is to serve," O.C.G.A. § 15–6–4.1 (1990), and "judges of the state court shall be elected by the qualified electors of the county or counties in which the court is located," O.C.G.A. § 15–7–20(b) (1990). The procedures to be employed in conducting these elections "shall conform as nearly as possible" to the procedures governing general elections in which state legislators are elected. O.C.G.A. § 21–2–138 (1993). Georgia law, however, also empowers the Governor with general authority to appoint individuals to fill vacancies in public offices, GA. CONST. Art. 5, § 2, ¶ 8 (1983); O.C.G.A. 45–12–50 (1990), and with specific authority to appoint individuals to fill vacancies in the judiciary, GA. CONST. Art. 6, § 7, ¶ 3 (1983); O.C.G.A. § 15–7–23 (1990).

The Georgia judicial electoral system involves aspects of both election and appointment. The vast majority of judges in this state have reached the bench via appointment. All judges and justices are subject to challenge in open elections at the expiration of their term of office. In reality, however, few incumbents are actually challenged in contested elections, and, of the few incumbents who are challenged, even fewer are defeated at the polls. Nevertheless, under the current system, qualified individuals can run against incumbent judges or justices in open elections and when that occurs, the voters choose who will serve them directly; the candidate having a majority of the votes in the election or the highest number of votes in a run-off wins. O.C.G.A. § 21–2–285.1 (1993).

### B. The Plaintiffs' Claims
#### 1. Generally

In their Complaint, the Plaintiffs challenge the current Georgia judicial electoral system

---

**9.** This has not always been the system by which judges reached the bench in Georgia. For a historical presentation of the changes in the Georgia Constitution that have led up to the present system, see *Ehrhart v. Miller,* File No. E–15871 (Superior Court of Fulton County, September 28, 1993).

**10.** The Georgia Constitution provides:

> All superior court and state court judges shall be elected on a nonpartisan basis for a term of four years. All justices of the supreme court and judges of the court of appeals shall be elected on a nonpartisan basis for a term of six years.
>
> GA. CONST. Art. 6, § 7, ¶ 1 (1983).

under the United States Constitution [11] and the Voting Rights Act of 1965. In their motion for approval of the proposed settlement and in the accompanying briefs and arguments, the Proponents have focused their attention on their strongest claim—the Voting Rights Act claim.[12] The Court will therefore focus on the Section 2 claim as well.

The Plaintiffs' primary challenge to the present system is that various components of the system dilute the strength of black voters in violation of Section 2 of the Voting Rights Act of 1965 ("VRA").[13] The Plaintiffs also make a claim under Section 5 of the Voting Rights Act. As noted *supra*, in November of 1993, the three-judge panel severed the Section 5 and Section 2 portions of this case and retained the Section 5 claim. Thus, this Court is only authorized to address the Section 2 claim.[14]

## 2. Section 2 of The Voting Rights Act

To make out a vote dilution claim under Section 2, a plaintiff must satisfy three threshold requirements: (1) the minority group, here African–Americans, must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politi-cally cohesive; and (3) the white majority must vote sufficiently as a bloc to cause it usually to defeat the minority's preferred candidate. *Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986); *see also Nipper v. Smith*, 1 F.3d 1171, 1177 (11th Cir.1993); *LULAC*, 999 F.2d 831 (5th Cir.1993).

In addition to the threshold requirements, the *Gingles* Court provided a list, although "neither comprehensive nor exclusive," of numerous other factors that may be relevant to the "totality of circumstances" analysis under Section 2. This list includes:

(1) the extent of any history of racial discrimination in the state that touched on the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state is racially polarized;

(3) the extent to which the state has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

---

**11.** Specifically, the Plaintiffs contend that the current system violates the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution.

**12.** In their stipulations, the Proponents do not even mention their other claims. (Pls.' and Defs.' Stipulations at 5–7.) Section 2 of the VRA was designed to assist in effectuating the Fifteenth Amendment, even though that amendment is self-executing. *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973). In a sense therefore, Section 2 broadens the rights granted by the Fifteenth Amendment. Thus, independent analysis under the Fifteenth Amendment would be duplicative and unnecessary. The Plaintiffs' other claims are not well developed. These other claims, however, are not deemed to be waived or abandoned at this point.

**13.** Section 2 of the Voting Rights Act, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political process leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

**14.** Thus, the Plaintiffs' argument that this settlement should be viewed as a remedy for a violation of the Section 5 claim irrespective of Section 2 is misdirected. (Pls.' Supplemental Br. at 1.)

(4) if there is a candidate slating process, whether minority group members have been denied access to that process;

(5) the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;

(8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

(9) whether the policy underlying the state's use of such voting qualifications, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles,* 478 U.S. at 37, 106 S.Ct. at 2759; *Nipper,* 1 F.3d at 1177–78.

To whatever degree the threshold factors and the list of additional factors are clear, that is where clarity ends. From that point forward, the waters are muddied and conflicts abound both among the Circuits and within the Eleventh Circuit itself.

Among the Circuits, there is significant conflict regarding the correct evidentiary standards for analyzing Section 2 cases, particularly those involving judicial elections. For example, the Eleventh Circuit has recently held that the proper statistical pool for measuring minority electoral success in a judicial election context is the total percentage of blacks in the state population, not the lower percentage of blacks who meet the minimum requirements to become a judge. *Nipper,* 1 F.3d at 1183. The Fifth Circuit, in contrast, recently held that the correct statistical pool in a judicial election case is the percentage of black attorneys eligible to become judges. *LULAC,* 999 F.2d at 866.

This conflict is not likely to be resolved in the foreseeable future as the Supreme Court has denied the petition for certiorari filed in the *LULAC* case. *LULAC,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

Within the Eleventh Circuit itself, the cases diverge "on the questions of whether plaintiffs can establish a Section 2 violation by proving the threshold *Gingles* factors, *see, Solomon v. Liberty County,* 899 F.2d 1012, 1017 (11th Cir.1990) (*en banc*) (per curiam) (Kravitch, J., specially concurring), *cert. denied,* 498 U.S. 1023 [111 S.Ct. 670, 112 L.Ed.2d 663] (1991), and whether defendants can thereafter raise a defense under the totality of circumstances. *Id.* at 1033 (Tjoflat, C.J., concurring)." *Nipper,* 1 F.3d at 1178, n. 11 (citing as recognizing division, *Hall v. Holder,* 955 F.2d 1563, 1568, n. 9 (11th Cir.1992)). Obviously, the *Gingles* factors have not been applied uniformly in all cases in the Eleventh Circuit. As a further indication of the uncertainty surrounding this analysis within the Eleventh Circuit, the mandate has been withheld in the *Nipper* case and a motion for rehearing is pending.[15]

In short, the state of the law surrounding Section 2 is in flux. To fulfill its role under Rule 23(e), however, the Court need not reach an absolute conclusion regarding whether the current system violates Section 2; rather, the Court must evaluate the Plaintiffs' probability of success. This is not a precise analysis, particularly where the law is unclear—indeed, the Court is not to resolve conflicting legal issues at this time. Nonetheless, the Court can distill from the above discussion the basic principles underlying a Section 2 claim and it is based on those principles that the Court must proceed.

Even if the law were clear, the factual record is deficient for the purpose of evaluating the merits of this case under Section 2. As noted *supra,* there has been no trial of the merits of this case, there has been no admission by the Defendants of Section 2

---

**15.** *Nipper* is probably still binding authority on courts in the Eleventh Circuit, until and unless the case is reversed, overruled, vacated, or otherwise modified by the Supreme Court or by the Circuit Court sitting *en banc. See, Martin v.* *Singletary,* 965 F.2d 944, 945 n. 1 (11th Cir. 1992). Because this issue is not essential to the Court's analysis of this case, the Court need not and does not reach this issue at this time.

liability [16], and the Proponents' stipulations are not unconditional or undisputed.[17] Generally, the Proponents' stipulations set out the history of Georgia voting law, the history of voting rights cases and racial issue litigation in Georgia, the history of Georgia public schools, the history of Georgia laws involving public accommodations, general demographic information and demographic information specific to the legal and judicial field, and an analysis of Georgia election results.

The Court has meticulously studied the Proponents' stipulations. It is wholly unnecessary, however, to recount the voluminous details of Georgia's history in this Order. The history of the states of segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof. Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception. Yet, Georgia has come a long way since the adoption of the Voting Rights Act of 1965 and many of the evils of Georgia's discriminatory history have been corrected. Unfortunately, some remnants remain.

The Proponents' stipulations are sufficient to raise a factual issue regarding what the Defendants have characterized as the "central disputed issue in this litigation"—whether the current Georgia judicial electoral system violates Section 2. (Defs.' Resp. to Intervenors' Statement of Undisputed Facts at ¶ 14.) Specifically, the stipulations leave genuine issues of fact regarding two of the three *Gingles* threshold requirements and several of the other considerations set forth in *Gingles*.

There remains an issue of fact regarding the satisfaction of the first *Gingles* threshold requirement. The first *Gingles* threshold re-

quirement is that the minority group, here African–Americans, must be sufficiently large and geographically compact to constitute a majority in a single-member district. *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766. Stipulation number 140 addresses this requirement:

> 140. Plaintiffs would offer evidence at trial that if judges were elected by subdistricts created within the boundaries of existing [judicial] circuits, it would be possible to create districts which had a majority African–American population in 20 circuits which elected 38 of the 159 (23.9%) judges. Said evidence would show, however, that only 27 of those judgeships (17.0% of 159) in 12 circuits would have an African–American voting age population in excess of 55%, and only 20 (12.6%) in 6 circuits would have an African–American voting age population in excess of 60% (each of those six circuits including a major metropolitan area—Atlanta, Albany, Columbus, Decatur, Savannah, and Valdosta).

(Pls.' and Defs.' Stipulations at ¶ 140). Stipulation number 141 also concerns this requirement:

> 141. Defendants at trial would offer evidence disputing and opposing that described in the preceding stipulation [number 140] on the grounds, *inter alia*, that the proposed subdistricts violate the principles recognized in *Thornburg v. Gingles*, 478 U.S. 30 [106 S.Ct. 2752, 92 L.Ed.2d 25] (1986) and *Shaw v. Reno*, [—— U.S. ——], 113 S.Ct. 2816 [125 L.Ed.2d 511] (1993), and that as a practical matter plaintiffs' subdistricting plan would not enhance materially the opportunity for African–Americans to be elected as judges.

(Pls.' and Defs.' Stipulations at ¶ 141). Clearly, the above two stipulations create a factual issue regarding the first *Gingles* threshold requirement. Compounding this factual uncertainly, the Intervenors and some of the objectors [18] have represented to the

---

**16.** To the contrary, the Defendants vehemently deny any such violation, and, in their opinion, as expressed by Attorney General Bowers at the fairness hearing, the Defendants would win this case if it went to trial. (Tr. at 235.)

**17.** For a more detailed explanation, see *supra* page 1554 and footnote 7 and accompanying text.

**18.** The GAAAA, for example, has indicated that it is in the process of accumulating evidence to

Court that they will contest the Plaintiffs' factual contentions if this case is allowed to proceed to trial.

There also remains a material issue of fact regarding the satisfaction of the third *Gingles* threshold requirement. That provision requires that the white majority must vote sufficiently as a bloc to cause it usually to defeat the minority's preferred candidate. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766. Stipulation number 73 provides that the courts have found racial bloc voting in some elections in eight Georgia counties.[19] These findings are some evidence of racial bloc voting. However, evidence of *some* racial bloc voting in eight of the one hundred fifty-nine Georgia counties, alone, is probably insufficient to sustain a conclusion regarding racial bloc voting in the State of Georgia as a whole.

In addition to the evidence of racial bloc voting in eight counties, "plaintiffs would offer evidence that voting rights challenges resulting in changes to at-large election systems have been brought in approximately 38 cities and 56 counties in Georgia between 1974 and 1990" (Pls.' and Defs.' Stipulations at ¶ 74), and "that forty-two (42) other voting cases have been brought in the thirty judicial circuits covered by the Department of Justice's objection letter of April 25, 1990" (*Id.* at ¶ 75). In contrast, "[d]efendants would offer evidence that the aforesaid cases include cases not based on the Voting Rights Act and cases not alleging racial discrimination." (*Id.*) Again, these stipulations present factual conflicts. Thus, there remains an issue of fact regarding whether there is enough evidence of white bloc voting to satisfy the third *Gingles* threshold requirement.

The stipulations leave questions, too, regarding several other relevant considerations set out in *Gingles. See, Gingles,* 478 U.S. at 37, 106 S.Ct. at 2759; *Nipper,* 1 F.3d at 1177–78. In particular, the stipulations do not answer, or their answers conflict, with regard to: the extent to which voting in the elections of the state is racially polarized; the extent to which the state has used unusually large election districts; whether political campaigns have been characterized by overt or subtle racial appeals; whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and whether the policy underlying the state's current voting system is tenuous.

### 3. Peripheral Issues

The Proponents argue that there have been several determinations adverse to the Defendants that justify settlement in this case irrespective of Section 2—namely, this Court's ruling that Section 5 applied to all superior court judgeships that were created after November 1, 1964, and the U.S. Attorney General's objections regarding those same judgeships. This Court's previous ruling, however, did not establish any Section 2 liability. *Brooks I,* 775 F.Supp. 1470, *aff'd,* 498 U.S. 916, 111 S.Ct. 288. Moreover, the Attorney General's objections were based largely on the State's failure to provide adequate information to the Department of Justice regarding the positions in question. The Attorney General ultimately found that the State failed to satisfy its burden under Section 5 of proving that the new judgeships would have neither the effect nor the purpose of discriminating on account of race. That finding, however, does not establish a Section 2 violation. Therefore, neither of these adverse determinations expressly found that the current Georgia judicial electoral system violates Section 2, and neither are the equivalent of such a determination.

As noted above, the Court must proceed in this case based on the reality that there has

---

challenge the Proponents' factual stipulations. They maintain that they did not have sufficient time to develop their case prior to the fairness hearing.

**19.** These counties include: Bleckley County, *Hall v. Holder,* 955 F.2d 1563 (11th Cir.1992); Burke County, *Lodge v. Buxton,* 639 F.2d 1358 (5th Cir.1981); Carroll County, *Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547 (11th Cir.

1987); Colquitt County, *Cross v. Baxter,* 604 F.2d 875 (5th Cir.1979); Dougherty County, *Paige v. Gray,* 437 F.Supp. 137 (M.D.Ga.1977); Fulton County, *Pitts v. Busbee,* 395 F.Supp. 35 (N.D.Ga. 1975); Putnam County, *Bailey v. Vining,* 514 F.Supp. 452 (M.D.Ga.1981); and Wilkes County, *Wilkes County, Georgia v. United States,* 450 F.Supp. 1171 (D.D.C.1978). (Pls.' and Defs.' Stipulations ¶ 73.)

been no determination that the current system violates Section 2 and that the Court cannot make such a determination at this point. Yet, even if the Court could make such a determination, or if such a determination were made after a trial of the merits, the Court would not be free then to fashion any remedy. Rather, the Court would be required, with the aid of the parties, to devise a remedy narrowly tailored to cure the problem that resulted in Section 2 liability. Given the discussion and holdings herein, the proposal embodied in the consent decree would not satisfy that requirement.

## C. Conclusion

In conclusion, there are a myriad of disputed factual issues that must be resolved before the Court can reach an answer to the ultimate question of whether the current system of electing judges in Georgia violates Section 2. The Court cannot resolve these factual issues in the context of this Order.[20] Thus, given the uncertainty of the law and the disputed state of the facts, the Court cannot say with any certainty or comfort that the Plaintiffs would be more likely to prevail at a trial of the merits than to lose. As a practical matter, therefore, the Court must proceed based on the reality that there has been no determination that the current system in Georgia violates Section 2 and that the likelihood of that conclusion, should this case proceed to trial, is questionable.

## VI. The Reasonableness of The Settlement Proposal

In this section, the Court's role comes full circle. The Court is left, in essence, with the inquiry with which it began—whether the proposed settlement is fair, adequate, reasonable, and legal under the circumstances.[21] In making this inquiry, the Court, now with the benefit of the above analysis, must examine the virtues and downfalls of the proposed settlement agreement. Thus, after examining the power of the Governor and Georgia Attorney General to settle this case, the Court will present the proposed settlement agreement, analyze its terms under state and federal law, and ultimately determine whether the Court should approve it.

### A. The Power of The Defendants to Settle

 The Governor and the Attorney General have the power to settle this case provided that the settlement terms do not violate the law. The Attorney General of the State of Georgia is the chief legal advisor to the executive department of the State and is charged with the duty to represent the State in civil and criminal cases. GA. CONST. Art. V, Sec. 3, Par IV (1983); O.C.G.A. §§ 45–15–3, 45–15–34, 45–12–26 (1990). The Governor is the chief executive of the state. GA. CONST. Art. V, Sec. 2, Par. I (1983). The Parties have not presented, nor has the Court uncovered, any specific constitutional, statutory, caselaw, or other authority, that expressly grants to the Georgia Attorney General the power to settle a law suit on behalf of the State. Nonetheless, the mere absence of an express grant of power is not always determinative. The Court finds that as a general principle, inherent in the duty of the Attorney General to represent the State is the power to settle a law suit against the State. To hold otherwise would be to require every law suit against the State to be litigated, as Mr. Bowers expressed at the fairness hearing, "to the hilt of the sword." (Tr. at 236.) Nothing in the law or in common sense suggests that requirement.

The Attorney General's power to settle, however, is no different than that of any other attorney. No lawyer can settle a case in contravention of the wishes of his clients or in contravention of the law. This is not a case where the Attorney General seeks to settle over the objection of his clients and to thereby impose his policy preferences over those of his state official clients. *See LULAC,* 999 F.2d at 840–41. In this case, the clients, namely the state Defendants and the Governor, approve of and support the consent decree.

The inquiry therefore turns to the legality of the provisions of the consent decree.

---

**20.** *See, supra* page ——.

**21.** *See, supra,* Section I.A.

Clearly, no party, including the consenting Parties in this case, and no attorney, including the Attorney General and the other attorneys involved in this case, can settle a case where the terms of the settlement violate the law.

Mr. Bowers argues that in a VRA case like this one, the Attorney General should be able to settle even if the terms of the settlement violate state law [22], provided that, in good faith, he perceives a significant risk of losing the litigation if it proceeded to trial. Mr. Bowers' reasoning is as follows. The Georgia Attorney General is sworn not only to support Georgia's Constitution and laws, but the Constitution and laws of the United States as well, and, in the event of a conflict between federal and state law, the Supremacy Clause would require his allegiance to federal law over state law. From that premise, Mr. Bowers argues that if the Attorney General has a good faith belief that a Georgia law violates federal law, he should not have to endure the added time and expense of a trial before giving effect to the federal law. Mr. Bowers concludes that if the Attorney General has a good faith belief that the State has a significant possibility of losing an action challenging a state law under a federal law, he should also not have to endure the expense and time of trial, but should be allowed to settle the case. Mr. Bowers is a highly principled public servant and the Court does not question his sincerity.

The Attorney General's argument fails in its leap of logic between its final premise and its conclusion. It is true that when there is a direct conflict between state and federal law the Supremacy Clause requires state law to yield. The Supremacy Clause, however, does not operate until a *direct* conflict is shown. As indicated *supra*, there has been *no determination* to date that the current Georgia system for the election of judges and justices violates Section 2. Without such a determi-

nation, the Supremacy Clause does not operate to invalidate the Georgia judicial electoral system. A perceived risk of failure at trial, even a good faith perceived risk of 25–40% as Mr. Bowers estimated at the fairness hearing, (Tr. at 235), is simply insufficient to establish a direct conflict between state and federal law. The Supremacy Clause, therefore, does not enlarge the power of the Attorney General regarding settlement at this time.[23] Ultimately, therefore, the power of the Attorney General, and the power of all parties for that matter, to settle a case such as this one depends on the legality of the provisions of the settlement agreement. The attention of the Court now turns in that direction.

## B. The Consent Decree

The proposed settlement, which takes the form of a consent decree, would work fundamental changes in the Georgia judicial electoral system. Under the consent decree [24], all current judges and justices who seek additional terms would not be subject to challenge in open elections, but would, instead, be subject only to non-partisan "retention" elections. (Consent Decree p. 10, ¶ 3.) These "retention" elections would be held at the same time as the general election and would require an affirmative vote of a majority of those voting on the question to retain a judge. (*Id.*) All current vacancies and all vacancies that arise as a result of the failure of a judge to be retained would be filled by gubernatorial appointment from a list of qualified individuals selected by the Judicial Nominating Committee ("JNC"). (*Id.* at p. 11, ¶ 6–7.) These appointed judges, after serving a minimum of two years, would be subject to regular "retention" elections. (*Id.* at p. 10, ¶ 3.)

Additionally, by December 31, 1994, the State would be required to have no fewer than 25 black superior court judges and

22. Mr. Bowers' argument is limited to the state constitutional and statutory context. Mr. Bowers does not suggest that he would have the power to settle if the terms of the settlement violated the United States Constitution.

23. Mr. Bowers admitted during the fairness hearing that in agreeing to this settlement and in

recommending to the Governor that he do the same, he was stretching the authority of both his office and that of the Governor. (Tr. at 236.)

24. A complete copy of the consent decree is attached to this Order as Exhibit A. Only the most significant provisions are discussed here.

would also be required to appoint five other black judges to either the state or superior court. (*Id.* at p. 10, ¶ 2.) In order to assist in meeting these numerical requirements, a new category of judgeships, "State Assignment Superior Court Judgeships" would be created and qualified black candidates would be appointed to these judgeships to serve in any of the State's judicial circuits by designation. (*Id.* at p. 11, ¶ 8.)

Subsequent to January 1, 1995, the JNC would recommend judicial candidates to the Governor without regard to race and both the JNC and the Governor would be prohibited from discriminating on the basis of race. (*Id.* at ¶¶ 11, 12.) The goal of the State, however, would remain a diverse judiciary reflective of the population of the State as a whole. (*Id.* at ¶ 15.)

## C. The Consent Decree and Georgia Law

The consent decree would violate both the language and spirit of the 1983 Georgia Constitution and the laws promulgated thereunder. Specifically, the system created under the consent decree would violate the Georgia Constitution's requirement that judges be elected, impermissibly alter the structure of power currently embodied in the 1983 Georgia Constitution regarding the election of judges, and violate several fundamental Georgia statutes.

### 1. "Election" Versus "Retention Election"

The consent decree calls for a change from the current system of potential contested elections to one of "retention elections." This change cannot be accomplished under the current Georgia Constitution.

The 1983 Georgia Constitution provides, in relevant part:

All superior court and state court judges shall be elected on a nonpartisan basis for a term of four years.

All Justices of the Supreme Court and Judges of the Court of Appeals shall be elected on a nonpartisan basis for a term of six years.

GA. CONST. Art. 6, § 7, ¶ 1 (1983). The language "elected on a nonpartisan basis" is not defined in the Georgia Constitution, statutes, case law, or any other binding or persuasive source.[25] Nonetheless, the Georgia Code does provide some relevant definitions from which it can be inferred that "election" does not contemplate a "retention election." Common usage, a previous unofficial opinion of the Georgia Attorney General and several Georgia cases support that conclusion.

The Georgia Code does not provide for retention elections. The term "election" is defined to mean "any general or special election." O.C.G.A. § 21-2-2(4) (1993); *see also* O.C.G.A. § 21-5-3(8). "General election" means "an election recurring at stated intervals fixed by law," O.C.G.A. 21-2-2(7), and normally refers to an election held for members of the General Assembly. *Brackett v. Etheridge*, 190 Ga. 216, 9 S.E.2d 275 (1940). " 'Special election' means an election that arises from some exigency or special need outside the usual routine." O.C.G.A. § 21-2-2(28). Nowhere in Georgia law is the term "retention election" present or defined. To read what the term "retention election" implies into the language of the 1983 Georgia Constitution or any of the statutes enacted thereunder violates basic rules of statutory and constitutional interpretation.

Furthermore, the plain meaning of the term "election" does not include the rather idiosyncratic concept of a "retention election." Retention elections are just not what one thinks of when she hears the word "election." Black's Law Dictionary defines the term "election" as:

the act of choosing or selecting one or more from a greater number of persons, things, courses, or rights. The choice of an alternative.... The selection of one person from a specified class to discharge certain duties in a state, corporation or society.

---

**25.** In *Ehrhart, supra* note 11, Judge Eldridge held that the language of the 1983 Georgia Constitution is broad enough to encompass retention elections. This Court, of course, is not bound by that decision. This Court's ultimate decision rests not only on state law, but federal law as well.

BLACK'S LAW DICTIONARY 464 (5th ed. 1979). The operative part of that definition was adopted by the Georgia Supreme Court in *Poythress v. Moses,* 250 Ga. 452, 453, 298 S.E.2d 480 (1983). Interestingly, within the same definition, Black's distinguishes between "election" and "appointment":

> With respect to the choice of persons to fill public office ... the term means in ordinary usage the expression by vote of the will of the people or of a somewhat numerous body of electors. "Election" ordinarily has reference to choice or selection by electors, while "appointment" refers to a choice by an individual.

BLACK'S LAW DICTIONARY 464 (5th ed. 1979). These definitions and their adoption by the Georgia Supreme Court support the conclusion that the term "election" does not, in plain language, common usage, or in the 1983 Georgia Constitution, embrace the concept of a "retention election."

In 1983, Attorney General Bowers himself reflected on the question of whether retention elections would satisfy the 1983 Georgia Constitution. He concluded as follows:

> As the Missouri State Plan does not reserve to the voter the opportunity of choosing "one or more from a greater number of persons," it does not constitute an "election" in the ordinary signification of that term. Rather, the submission of such a question [to retain a judge or not] is more closely akin to a "referendum." Historically, the terms "election" and "referendum" are not synonymous. Accordingly, it is my unofficial opinion that the constitutional requirements of Art. VI, Sec. VII, Par. I, could not be met by the adoption of the Missouri state plan by statute, but would require specific constitutional authorization.

1983 Op.Atty. Gen.Ga. 205 (Jan. 11, 1983). Notably, Mr. Bowers incorporated and partially relied on the Black's Law Dictionary definition of the term "election" discussed above in his Opinion. When the Court questioned Mr. Bowers about that Opinion at the

fairness hearing, he responded: "Yes, sir. I stand by that." (Tr. at 254.) The Attorney General's Unofficial Opinion supports the Court's conclusion that the term "election," as the term exists in the 1983 Georgia Constitution, is not broad enough to encompass a retention election system.

Moreover, some Georgia case law indicates that retention elections would not satisfy the requirements of Georgia law because of the restrictive ballot used in those elections. For example, in a case challenging part of a municipal charter restricting electors to choosing only names of candidates that appeared on the ballot, the Georgia Supreme Court held that such a restriction violated the Constitution: "the individual elector has the unshackled right to write on the ballot any person he wishes to vote for, and can not be restricted to a choice between those whose names are provided on the ballot." *Thompson v. Willson,* 223 Ga. 370, 373, 155 S.E.2d 401 (1967) (citing *Stewart v. Cartwright,* 156 Ga. 192, 198, 118 S.E. 859 (1923); *Griffin v. Trapp,* 205 Ga. 176, 182, 53 S.E.2d 92 (1949)). While that case was decided under the 1945 Georgia Constitution, and in a somewhat different context than the present, its holding remains the law of this State. Under the consent decree, the electorate would not only be "restricted to a choice between those whose names are provided on the ballot," but would be restricted to *one name* on the ballot.[26] This restriction would not satisfy Georgia law.

Hence, while the term "election" as used in the 1983 Georgia Constitution is not expressly defined, the Georgia Code, common usage, the Black's Law Dictionary definition, an unofficial Attorney General opinion, and several Georgia cases all indicate that the term is not broad enough to encompass the retention election system set forth in the consent decree.

The Proponents argue, however, that the language "elected on a nonpartisan basis" is broad enough to encompass retention elections. Essentially, the Proponents support

---

26. The Consent decree calls for a ballot of the following form: "Shall _____ be retained as [judge] [justice] of the _____ court for _____ years? _____ yes _____ no."

(Consent decree at 11, ¶ 3.)

their assertion with two arguments. First, the Proponents point to the historical variation in what constituted judicial elections in Georgia. Historically, judicial elections have not always meant a contest between multiple candidates voted on by the people. In some instances, the 1877 Georgia Constitution, for example, judicial elections were conducted by majority vote of the General Assembly. GA. CONST. Art. VI, Section II, Para. IV, IX (1877). In other instances, the General Assembly would provide by statute how new judgeships would be filled. *E.g.,* GA. CONST. Art. V, Section II, Para. I (1976); GA. CONST. Art. VI, Section III, Para. I (1945). In still other instances, judges were appointed by the governor. *E.G.,* GA. CONST. Art. V, Section II, Para. III (1945). Based on this varied past, the Proponents contend that there is no deep-rooted right recognized in Georgia constitutional law for the people to elect their judges in contested elections.

This argument is unavailing. Although the term "election" is not defined by the 1983 Constitution, and while Georgia has not always selected judges in the manner it does so now, the term "election" has never—expressly or impliedly—meant "retention election." Elections throughout Georgia history have always involved a choice between known candidates. Additionally, Georgia's varied history of judicial elections does not indicate that Georgia voters do not consider this right important or that Georgia voters are somehow not vested in their own system. To the contrary, Georgia voters have a nearly century long history of electing their judges and justices. The details have not always remained constant, but the citizens of Georgia have created a system, embodied it in a constitution, and ratified it in accordance with the law. The citizens of Georgia are entitled to live under the system they designed and ratified until that system is declared unconstitutional, contrary to federal statutory law or is modified through the amendment process.

Second, the Proponents assert that the term "election" is unrestrictive and thus should be read broadly, at least broadly enough to include retention elections. This argument is also not persuasive. The "Missouri Plan" existed for quite some time before the 1983 Georgia Constitution was drafted. In fact, there is evidence that the people involved in the drafting of the 1983 Constitution considered the "Missouri Plan" and disagreed over its merits. *See,* Tr. of Meetings, Committee to Revise Article VI, volumes I through III, Aug. 22, 1980, at 81–82, *reported in, Ehrhart, supra* n. 11, at 32–34. Since there is evidence that retention elections were considered and, after consideration, not specifically enacted, there is no reason to read the term "election" more broadly than its common definition. Moreover, as indicated above, the Georgia Code, common usage, the Black's Law Dictionary definition, an unofficial Attorney General opinion, and Georgia cases all cut against the Proponents' argument.

In conclusion, a retention election cannot satisfy the current constitutional requirement that judges be elected. "Under our system of government the method of expressing the will of the people is by voting in a legally held election." *Wheeler v. Board of Trustees,* 200 Ga. 323, 334, 37 S.E.2d 322 (1946). Under the present Georgia constitution, "retention elections" would not be legally held elections. The consent decree system, therefore, would violate Georgia law.

### 2. The Power Structure

The consent decree also violates Georgia law by impermissibly altering the structure embodied in the Georgia Constitution that defines the rights and power of the Governor, the voters, and qualified potential candidates. These alterations remove power from the people, both as voters and as qualified potential candidates.

### a. The Power of the Governor

The consent decree modifies the role of the Governor in the Georgia judicial electoral system. The Opponents submit that this change violates the Georgia Constitution.

Historically, the power of the Governor to appoint judges and justices has varied greatly. Under some previous Georgia constitutions, the 1877 and the 1945 Constitutions for example, the Governor was afforded broad powers of appointment, while under other constitutions, the Governor's power was more

restricted. The Georgia courts have strictly construed the powers of appointment granted to the Governor. *E.g., Hooper v. Almand*, 196 Ga. 52, 58–60, 25 S.E.2d 778 (1943); *Patten v. Miller*, 190 Ga. 123, 124, 8 S.E.2d 757 (1940); *Mulcay v. Murray*, 219 Ga. 747, 755, 136 S.E.2d 129 (1964).

The 1983 Constitution empowers the Governor with broad general authority to appoint individuals to fill vacancies in public offices. GA. CONST. Art. 5, § 2, ¶ 8 (1983) ("When any public office shall become vacant by death, resignation, or otherwise, the Governor shall promptly fill such vacancy unless otherwise provided by this Constitution or by law...."); *See also* O.C.G.A. 45–12–50 (1990). The Governor also has broad specific authority to appoint individuals to fill vacancies in the judiciary. GA. CONST. Art. 6, § 7, ¶ 3. (1983) ("Vacancies shall be filled by appointment of the Governor....").

Some Objectors argue, however, that the power of the Governor to appoint is not independent, that it was not granted in a vacuum, and that it must be viewed in light of the entire power structure—a structure that contemplates the ability of qualified candidates to challenge the Governor's appointee in open elections and the ability of the people to ultimately choose their judicial representative. These Objectors' argument is well taken. It is true that the consent decree would expand the power of the Governor in the manner discussed above, but this expansion does not contradict the 1983 Georgia Constitution. In that Constitution, the people of the State of Georgia significantly increased the breadth of the Governor's power to appoint. In light of that expansion, the Court concludes that the consent decree would not confer constitutionally impermissible power on the Governor to fill vacancies. If there is a problem with the consent decree, this is not where it lies.

### b. The Power of the Electorate. (Voter Rights)

 The consent decree violates Georgia law by impermissibly decreasing the power of the electorate. First and foremost, the consent decree would remove the right of the electorate to choose directly via contested elections who will represent them in a partic-

ular judicial post. The voters, under the consent decree, would also lose the ability to offer a candidate of their choosing against an incumbent judge.

There is no dispute that under the proposed system the voters would no longer directly choose their judges via contested elections. Voters would still have the right to vote, but their choice would be limited to either retaining the incumbent or accepting whomever the Governor appoints. As discussed *supra* in section VI.C.1, such elections would violate the 1983 Georgia Constitution. Thus, obviously, the change from the current system to one of appointment and retention elections involves some measure of disenfranchisement.

The Proponents assert that this disenfranchisement is marginal since there are few actual contested judicial elections and since few incumbents are defeated even when there is an election. Additionally, the Proponents argue that voter participation would actually increase under the proposed system because voters would have an opportunity to vote on the retention of every judge, as opposed to only the ones who are challenged, in every general election.

The people of the State of Georgia have, both individually and through their elected representatives, developed, codified, and ratified the current system of electing judges. Under the current system, the people have reserved for themselves the right, and the corresponding responsibility, to vote directly for their judicial candidates. See GA. CONST. Art. 6, § 7, ¶ 1 (1983); O.C.G.A. § 21–2–138 (1993). It is true that under the current system there are relatively few contested judicial elections, but there is always the potential for one. Within this potential lies the power of choice. By removing this potential, the consent decree would remove from the people the power of direct choice and place that power in the Governor and the Judicial Nominating Committee. This potential is worthy of protection and indeed must be protected under the current Georgia Constitution at least until such time that the Georgia system is legally changed, declared unconstitutional or held to be violative of federal law.

Under the proposed system, the voters would suffer a more subtle loss—the ability to solicit individuals to challenge incumbent judges. Under the present system, an individual who wishes to remove a judge from the bench has three choices: (1) she can vote against that judge in a contested election if there is one, (2) she can create a contested election by running against the incumbent judge if she is qualified, or (3) she can solicit another qualified candidate to run against the incumbent judge. While this last right is nowhere enumerated in a constitution or statute, it has historically, and it remains today, a fundamental characteristic of American grassroots politics. Under the proposed system, the only choice a voter has is between the incumbent and an unknown candidate to be selected by the Governor and the JNC. Therefore, the consent decree would transfer the power to "submit" candidates from the people themselves to the JNC, thus clearly diminishing the power of the electorate. Absent a voluntary relinquishment of the right to select candidates of their choice, the Georgia electorate cannot be required to surrender to the JNC a right that is reserved to them by the State Constitution.[27]

The Proponents make numerous other arguments in support of their position. The essence of these arguments is that the proposed system would be a better system than the current system. The Proponents may be right, but in a republic, the people have a right to err. The proper inquiry is not whether the proposed system is better, but whether it should be approved under the circumstances. The Court finds a certain irony in using the Voting Rights Act to deny citizens the right to select public officials of their choice. Thus, the Proponents' remaining arguments are rejected.

### c. The Power of Qualified Potential Candidates

■■■■ The consent decree further skews the current system's balance of power away from the people by abrogating the right of qualified individuals to challenge incumbent judges in open elections. Under the current system, an individual who seeks to become a judge, if otherwise qualified, may declare his candidacy and run for office. The consent decree would abolish that right and require, instead, that qualified individuals who wish to be judges apply to the JNC. Appeal to the people would be replaced by appeal to the JNC, local politics would be replaced by state politics—the entire nature of the political structure would change. Additionally, not every bench would be available for a candidate; only those benches that were vacated via a retention election or newly enacted by the legislature would be open for challenge. In short, the will of qualified potential candidates, and ultimately the will of the people themselves, would be replaced by the collective will of the JNC and the Governor.

The Proponents assert that there is no constitutionally protected right to run for judicial office and that, in any event, history shows that only a small number of people challenge incumbent judges. This Court has held *supra*, that the current judicial electoral system was created under and is supported by the 1983 Georgia Constitution. Thus, arguably, the right of qualified individuals to seek the bench through the current system is constitutionally guaranteed. If this right is protected, the number of people to whom it applies is irrelevant; it is the *potential* to run that must be protected. Thus, the Proponents' position is untenable. The Court must protect this right, at least until such time that the Georgia Constitution is again amended or the provisions creating the right in question are held to be legally void.

### 3. Miscellaneous Violations

■■■■ The consent decree would also violate Georgia law in other ways. Most importantly, for example, the consent decree

---

**27.** The Proponents argue that the JNC represents the people and is highly qualified, because of experience and background, to assess the qualifications of judicial candidates. Moreover, the Proponents contend that voters could influence JNC submission decisions by informing the JNC of their support for a particular candidate. Notably, however, the members of the JNC are not elected, they are appointed by the Governor. Members of the JNC, therefore, have no direct accountability to the people. The people will be left with only indirect influence at best over who would serve as judge in their community. This represents a major change to a fundamental right.

would effectively amend the Georgia Constitution without undergoing the amendment process provided for within that document—that is, the amendment would take effect without a ⅔ vote of the General Assembly or ratification by the electorate. *See* GA. CONST. Art. 10, § 1, ¶¶ 1, 2 & 5 (1983). Furthermore, the consent decree creates a category of judges, "state assignment superior court judges," a function normally reserved for the Georgia General Assembly. This amounts to an improper usurpation of legislative power. There may be other less significant violations that the consent decree would effect, but the Court can conceive of no purpose in continuing to look for them. Of course, if the Court had or were to conclude that the current system violates Section 2, the Court would be authorized to circumvent these state law provisions. But absent such a determination, the Court must defer to state law. *See, e.g., Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982).

### 4. Conclusion

For the reasons stated above, the system set out in the consent decree cannot be given effect under the current Georgia Constitution. Specifically, retention elections do not satisfy the Georgia Constitution's requirement for the election of judges, the consent decree would impermissibly alter the balance of power embodied in the current system regarding judicial elections by transferring power from the electorate and qualified potential candidates to the Governor and a gubernatorially appointed judicial nominating committee, and the consent decree would violate Georgia law in other ways as well. Georgia voters have embodied their preference for the present system of judicial elections in their current Constitution, and without either a voluntary amendment or a judi-

cial determination that the system violates federal law, the Court cannot and will not set aside that preference. If the people of Georgia wish to change their Constitution, their Constitution sets forth an amendment process by which they can accomplish that goal.

### D. The Consent Decree and Federal Law

The Opponents raise several federal law challenges to the consent decree. They assert that the consent decree violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Fifteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act of 1965. The Opponents have not, however, presented the Court with a sufficient record regarding the provisions of the consent decree and their effects for the Court to analyze those provisions under the Fifteenth Amendment or Section 2 of the Voting Rights Act.[28] At best, there exist material questions of fact regarding those claims. The consent decree does, however, contain provisions that violate the Equal Protection Clause of the Fourteenth Amendment.[29]

The Equal Protection Clause prohibits any state from denying to any person within its jurisdiction equal protection of the laws. U.S. CONST. Amend. 14, § 1. The rights created by the Fourteenth Amendment are guaranteed to the individual. *University of California Regents v. Bakke,* 438 U.S. 265, 289, 98 S.Ct. 2733, 2747, 57 L.Ed.2d 750 (1978). This principle has served as the legal gem that gave hope and inspiration to those who dreamed of racial equality under the law.

We continue to strive for the ideal of a "color-blind" Constitution, *Shaw v. Reno,* ——

---

**28.** Obviously, many of the same problems regarding Section 2 plague the Opponents as plagued the Proponents. *See, supra,* Section V.B.

**29.** Voting is a fundamental right. Indeed, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1963). As such, the Opponents might also be able to attack the consent decree as a violation of their substantive due

process rights. This argument would require strict scrutiny by the Court to determine whether the changes to Georgia citizens' voting rights contemplated by the consent decree were *necessary* to achieve a *compelling* state interest. Substantive due process though, has typically been limited in its application to cases involving rights other than voting, and in light of the conclusions reached in this Order, the Court declines to speak further on this issue.

U.S. ——, ——, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993) (citing *Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting)), and we continue to recognize that classifications based on race "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality," *Kiyoshi Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Therefore, the Supreme Court has repeatedly denounced racial classifications as "presumptively invalid," *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) (citing *Brown v. Board of Ed. of Topeka, Shawnee County, Kan.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964)), regardless of which race is benefitted or burdened by the classification and regardless of whether the classification is benign or invidious. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989); *Shaw v. Reno*, —— U.S. at ——, 113 S.Ct. at 2828. Not all racial classifications are unconstitutional, but the courts must subject such classifications to "the most rigid scrutiny." *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944).

Recently, the United States Supreme Court recognized that "racial classifications with respect to voting carry particular dangers" of "balkaniz[ing] us into competing racial factions" and "threaten[ing] to carry us further from the goal of a political system in which race no longer matters." *Shaw*, —— U.S. at ——, 113 S.Ct. at 2832 (holding that white voters may challenge irregularly shaped voting districts that can be explained only on the basis of race under the Fourteenth Amendment). These observations confirm the wisdom of applying strict scrutiny to racial classifications.

The strict scrutiny inquiry has two parts. First, the racial classification must be justified by a "compelling government interest." *Wygant v. Jackson Board of Ed.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (citations omitted). Second, the means chosen by the state to effectuate its

purpose must be "narrowly tailored" to achieve that goal. *Id.* (plurality opinion).

### 1. Compelling Governmental Interest

A state actor is said to have a "compelling governmental interest" only when its true concern in distinguishing between its citizens on account of race is to remedy its own history of racial discrimination. *See, Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. Yet, as Justice O'Connor noted, the true reason for the classification is not always apparent—searching judicial inquiry is necessary to "smoke out" remedial classifications. *Croson*, 488 U.S. at 493, 109 S.Ct. at 721.

Thus, the state must identify past discrimination with "specificity," *Id.* at 504, 109 S.Ct. at 727, "based upon 'particularized' findings of earlier discrimination in the affected industry." *Peightal v. Metropolitan Dade County*, 815 F.Supp. 1454, 1463, *aff'd*, 940 F.2d 1394 (11th Cir.1991) (citing *H.K. Porter Co. v. Metropolitan Dade County*, 975 F.2d 762, 766 (11th Cir.1992) [*vacated*, 998 F.2d 892 (1993)] and *Cone Corp. v. Hillsborough County*, 908 F.2d 908, 913 (11th Cir.1990)). "Generalized allegations of discrimination in the subject industry, or in education and training, have little probative value in identifying discrimination in the relevant industry." *Peightal*, 940 F.2d at 1403 (citing *Croson*, 488 U.S. at 503, 109 S.Ct. at 726–27). Gratuitous statements by public officials assigning benign or remedial objectives is inadequate without additional proof. *Id.* While a precise test of what degree of evidence is sufficient to justify a racial classification is probably not possible, the Supreme Court has held that the state actor must have "a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1849.

This case is difficult to analyze under the above standard. The usual equal protection claim reaches the court as a challenge to some governmental action, policy, or preference that discriminates between citizens on account of their race. That is the type of case for which the above analytical standard was designed. This case is different. The State is not pursuing a voluntary affirmative action plan. The State has not, through its legislative authority or otherwise, enacted

the provisions contained in the consent decree into law. In fact, as discussed *supra,* because the consent decree contains provisions that violate the 1983 Georgia Constitution, the legislature could not enact the consent decree provisions even if it wanted to without first amending that Constitution. This is a case in which the Proponents seek to use the coercive power of the Court to lend credence to an action that might not be accomplished directly through the established mechanism for change—amendment to the State Constitution.

As a practical matter therefore, the State has not set forth its interests as it normally would have done if it were supporting an affirmative action program. In light of the Defendants' denial of Section 2 liability, the Defendants' actual motivating interest in supporting this settlement appears to be the resolution of this case, as opposed to the correction of historical discrimination by the State. An interest in resolving litigation alone is clearly insufficient to justify a race-based preference of any sort.

The State has, however, recommended this settlement agreement. Consequently, the Court will treat this case as if the provisions of the consent decree had been approved by the State as an affirmative action plan. Thus, for the purpose of this equal protection analysis, the Court will ascribe to the State the strongest possible interests to support the provisions of the consent decree—the eradication of its history of discrimination against blacks in the legal and judicial fields and the elevation of public confidence in its judicial system by increasing diversity on the bench.

There is sufficient evidence to support these ascribed state interests. Blacks have been discriminated against in the State of Georgia both in general and in the legal field. Georgia's racially discriminatory history was addressed to some degree earlier in this Order and will not be repeated here.[30] Suffice it to say that Georgia has generally discriminated against blacks in many areas, including public education and accommodations, employment and contracting, and elections and public representation. While generalized findings of discrimination are insufficient in themselves to justify race-based remedial measures, *Peightal,* 940 F.2d at 1403 (citing *Croson,* 488 U.S. at 503, 109 S.Ct. at 726–27), these findings are important to set the stage for the evaluation of discrimination in more particularized areas.

In the legal field, blacks were not admitted to Georgia's law schools until the 1960's and then only in token numbers. Normally, generalized findings of discrimination in education is indeterminative. *Id.* However, law school is the gateway to the legal field and an absolute prerequisite to becoming a judge. Of course, there are also educational prerequisites to law school. Thus, the effects and importance of discrimination in educational opportunity and general educational disparity in a case like this one cannot be overstated. The Court should not, however, be misunderstood on this point. The Court does not accept as fact that the only reason why blacks are not represented in the legal field in proportion to their percentage in the population is because of discrimination in education. Many other reasons may play a role. Furthermore, there is no evidence that people occupy fields in proportion to their percentage in the population. Nevertheless, disparity in educational opportunities, particularly at the law school level, but certainly at lower levels as well, has played a role in artificially minimizing the number of blacks in the legal field.

Today, approximately two to four percent (2–4%) of the members of the State Bar of Georgia are black and of those, an even smaller number have been admitted to the practice of law for long enough to meet the requirements to become a judge. The record indicates racial bloc voting in some county elections where blacks have run whites in contested judicial elections,[31] and a disparity

---

30. *See, supra* pages 1560–1561 and Pls.' and Defs.' Stipulations.

31. As noted earlier, the statistics are not homogenous. While there does appear to be evidence of some racial bloc voting in eight counties, whether that finding is sufficient to ascribe the characteristic of racial bloc voting to the State of Georgia as a whole is questionable. *See, supra,* page 1561.

between the percentage of black judges presently sitting on the state court, superior court, and court of appeals and the percentage of blacks in the Georgia population. The Proponents assert that Georgia's history of racial discrimination in general and in the legal (and judicial) field are sufficient to support a finding that Georgia has a compelling government interest to eradicate the effects of past discrimination in the legal field and to ensure the continued confidence in its judicial system by increasing diversity on the bench.

To justify remedial measures, there must be particularized findings of discrimination by the particular government entity in question. *Peightal,* 815 F.Supp. at 1463, *aff'd,* 940 F.2d 1394. Even so, Georgia electoral history is marked by too many occasions where the State, through its elected officials, enacted discriminatory measures designed to minimize black voting strength.[32] Additionally, it was not only private law schools, but State law schools as well, that discriminated against blacks in admissions, and it was not only some amorphous group of voters who discriminated at the polls, but Georgia voters. Hence, the Court finds that there is sufficient evidence of discrimination by the State against blacks in the legal and judicial fields to support a compelling government interest in its eradication. This compelling state interest would justify a narrowly tailored plan designed to eradicate the effects of Georgia's discriminatory history.

### 2. Narrowly Tailored and Necessary to Achieve State's Interest

The next inquiry is whether the provisions of the consent decree are "narrowly tailored" and necessary to achieve the State's interest. *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847. This requirement essentially demands that the proposed remedial action be the least intrusive alternative—the alternative most precisely suited to achieve the government's compelling interest. *See, Peightal,* 940 F.2d at 1406 (citations omitted). The courts are guided by several considerations in determining whether this prong of the equal protection test is met: (1) the efficacy of alternative remedies; (2) the flexibility of the proposed

remedy; (3) the duration of the burden imposed by the proposed remedy; (4) the relationship between the number of minority people benefitted by the plan versus the number of minority people in the relevant population; (5) the effect of the remedy on innocent third parties; and (6) the availability of waiver provisions. *See, Id.,* 940 F.2d at 1407 and n. 34 (citations omitted). Not all of these factors are relevant in every case. Nevertheless, the Court will examine each of the above factors in the context of this case.

The Court is particularly concerned with the validity of two of the consent decree provisions—the "thirty judge minimum" requirement and the state assignment superior court judge provision.

The consent decree provides:

By December 31, 1994, there will be a total of no fewer than 25 black superior court judges serving, which would be a total derived from (1) those serving in existing seats, (2) those serving in enacted but unfilled seats, (3) persons appointed to State Assignment Judgeships, and (4) persons appointed to newly enacted seats in existing circuits prior to December 31, 1994. In addition, by December 31, 1994, five other black persons will be appointed to either state or superior court seats....

(Consent Decree at 10, ¶ 3.) (hereinafter referred to as the "thirty judge minimum" provision). This provision is clearly designed to increase the number of black judges to a level proportionate to the percentage of blacks in the Georgia population.

The Consent decree further provides:

A special category of superior court judges will be created known as State Assignment Superior Court Judgeships, and this category of judges shall exist for a period not to exceed 10 years. Qualified minority lawyers will be appointed as such judges by the Governor, upon review and recommendation by the JNC. State assignment judges will be authorized to serve, by assignment, in any circuit in the state.

(Consent Decree at 11–12, ¶ 8.) This provision is designed to increase black representa-

---

**32.** *See, supra,* p. 1561–1563. *See also* Pls.' and Defs.' Stipulations.

tion in the judiciary and specifically to aid the State in meeting the thirty judge minimum requirement. The validity of this provision consequently turns largely on the validity of the thirty judge minimum requirement. Ultimately, the validity of the entire consent decree with regard to equal protection depends upon the validity of the above provisions. Thus, these provisions will be analyzed together under the factors outlined above.

### a. The Efficacy of Alternative Remedies

The first inquiry is whether the Proponents considered race-neutral means to achieve their interest. *See, Croson,* 488 U.S. at 507, 109 S.Ct. at 729; *Peightal,* 940 F.2d at 1407. This factor is normally decisive as the existence of a race-neutral solution would indicate that a race-based solution was not necessary. *Id.* Yet, in this case, as explained *supra,* the consent decree is not a voluntary affirmative action plan that the State seeks to implement. Indeed, the State would deny any wrongdoing sufficient to justify such remedial action. In that sense, this case raises similar concerns to those raised in *Croson,* namely that racial politics, as opposed to pure remedial impetus, motivated the adoption of the race-based preference plan. *Croson* 488 U.S. at 495–96, 109 S.Ct. at 722–23 (concern based on fact that five of the nine city council members who approved preference plan were black). The State has been subjected to great pressure and expenses as a result of this case. Impending deadlines and an overworked judiciary frozen in its current form by Court order and jeopardized by the outcome of this case add to the tension.

Yet, the Proponents likely considered every possible alternative during their extensive settlement negotiations,[33] including race-

neutral alternatives, and concluded that the proposed plan is the best compromise possible. This consideration is not dispositive, but it weighs in favor of validity under the Equal Protection Clause.

### b. The Flexibility of The Proposed Remedy

Flexibility is an important factor in ascertaining whether a proposed plan meets the "narrowly tailored" prong of the equal protection inquiry. The Supreme Court has been highly critical of rigid quotas. *E.g., Croson,* 488 U.S. at 508, 109 S.Ct. at 729; *See also, United States v. Paradise,* 480 U.S. 149, 197, 107 S.Ct. 1053, 1080, 94 L.Ed.2d 203 (1987) (O'Connor, J., dissenting). The Eleventh Circuit has recognized this criticism: "unyielding preferential quotas will normally doom an affirmative action plan." *Peightal,* 940 F.2d at 1408. Goals that are less rigid, that do not set forth strict numerical requirements, are more likely to survive scrutiny. *Id.* (citing *Johnson v. Transportation Agency, Santa Clara County,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *Wygant,* 476 U.S. 267, 106 S.Ct. 1842).

The thirty judge minimum requirement is in the form of quota. It utilizes mandatory language ("there will be ...") and sets forth absolute numerical minimum requirements. This inflexibility weighs heavily against Constitutional validity. The state assignment judgeship provision does not pose a significant flexibility problem independent from the thirty judge minimum requirement.[34]

The inflexibility of the thirty judge minimum requirement is further evidenced by its reliance on race as *the* determinative factor, as opposed to one of several factors for consideration.[35] The Proponents argue that race is only one of several considerations because if a candidate does not meet the requirements set forth by Georgia law, he or

---

33. *See, supra,* Section II.

34. The Court is concerned, however, that this provision does not limit the number of judges that can be appointed thereunder. This imprecision might arguably increase the provision's flexibility, but there is nothing in the provision to ensure its use only for remedial purposes. Thus, this inexactness cuts both ways.

35. In this sense, the provision reminds the Court more of the University of California at Davis

Medical School's preference system that focused "solely on ethnic diversity" (held to violate equal protection) rather than the Harvard College preference system that made race a "plus" in an applicant's file, but "did not insulate the individual from comparison with all other candidates for the available seats." (held to survive equal protection challenge.) *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 315–18, 98 S.Ct. 2733, 2761–62, 57 L.Ed.2d 750 (1978).

she cannot be appointed judge. This argument misses the point. No matter how qualified a non-black applicant is, under the consent decree race is determinative. Surely our system of justice does not need diversity at that price. This inflexibility weighs heavily against, if it is not dispositive of, the validity of this provision under the narrowly tailored prong of the equal protection inquiry.

#### c. The Duration of The Proposed Remedy

The duration of a race-based preference is relevant to the "narrowly tailored" prong of the equal protection inquiry. Limited duration ensures that a remedial plan does not last longer than is absolutely necessary to achieve the Government's interest. *Peightal,* 940 F.2d at 1408 (citing *Fullilove v. Klutznick,* 448 U.S. 448, 513, 100 S.Ct. 2758, 2792, 65 L.Ed.2d 902 (1980)).

The thirty judge minimum requirement must be satisfied by December 31, 1994. After that date the JNC would be prohibited from considering race in making recommendations to the Governor and the Governor would be prohibited from considering race in making judicial appointments. While on its face this language limits the duration of this provision, the limitation is of questionable utility in an equal protection sense.

Indeed, the consent decree also provides that "the goal of the State of Georgia is a diverse judiciary reflective of the population of the state as a whole." (Consent Decree at 14, ¶ 15.) Reconciliation of this goal and the above durational limitation, while not impossible, raises some concerns for the Court. The impetus for these concerns was best highlighted by Mr. Alexander's cross-examination of Tyrone Brooks regarding the durational limitation of this provision during the fairness hearing on January 12, 1994:

Q. Then at the end of that time [January 1, 1995], race can't be—is not to even be considered?

A. Well, now if you read the agreement—and I wish you would get a copy—it stipulates that the goals of Georgia is to have a judiciary that is reflective of the diverse population of this state.

So how you can not—if you're looking at diversity, how can you not consider race.

(Tr. at 70). As Mr. Brooks' answer indicates, the State's goal could require continued consideration of race in making judicial appointment decisions well beyond the 1994 deadline, despite the restrictions contained in the consent decree. This inconsistency illustrates a potential problem with the duration of this provision.

Additionally, the durational limitation of the thirty judge minimum requirement is not tied to the achievement of any specific goal or interest. The preference does not end until December 31, 1994, regardless of when the numerical minimum requirements are met. Thus, the race-based preference could continue beyond the time necessary for the achievement of the State's interest.

In light of the above discussion, the December 31, 1994, time limit does not operate as much as a limit on duration as it does a deadline for reaching the thirty judge minimum requirement. In that sense, the deadline is more a part of the problem—it limits flexibility and increases the possibility that the JNC will focus on race as a determinative factor—than it is a part of the solution—a durational limitation.

The state assignment judgeship provision has a maximum duration of ten years. While this duration is not a problem on its face, it, like the duration limitation in the thirty judge minimum requirement, is not tied to the achievement of any specific goal or interest. Thus, the race-based preference contained in this provision might continue beyond the time that it is necessary for the achievement of the State's interest. Therefore, while limited duration is normally a factor that weighs in favor of the validity of a provision, the durational limitations contained in the provisions in question do not so operate.

#### d. The Relationship Between The Proposed Remedy and The Relevant Population

The courts also consider the relationship between the proposed remedy and the relevant population in assessing whether a reme-

dial system is narrowly tailored. *United States v. Paradise*, 480 U.S. at 187, 107 S.Ct. at 1075 (Powell, J., concurring). In essence, this inquiry requires the Court to analyze whether the proposed remedy's reach is drafted narrowly so that it does not overstep the government's compelling interest. As discussed below, the Court concludes that this provision is not so drafted.

. Currently, two to four percent of the Georgia Bar is black and of that percentage, a lesser percentage have been admitted to the practice of law long enough to meet the requirements to become a judge. Yet, as noted in *Croson*, "the mere fact that black membership in these trade organizations is low, standing alone, cannot establish a prima facie case of discrimination." *Croson*, 488 U.S. at 503, 109 S.Ct. at 726–27. The percentage of black judges currently serving at each level of the Georgia judiciary exceeds the percentage of blacks in the Georgia Bar. Approximately 6.2% of the superior court judges, 8.5% of the state court judges, 11% of the appeals court judges, and 28.6% of the supreme court justices in Georgia are black. Comparing these numbers to the small percentage of black membership in the Georgia Bar, it is clear that the percentage of black judges currently exceeds the percentage of blacks in the population who are qualified to serve as judges.

The Proponents, relying on *Nipper*, argue that the proper pool for statistical analysis of this case is the percentage of blacks in the general population of the State of Georgia (approximately 27%) [36] not the lower percentage of black members of the Georgia Bar (approximately 2–4%), or the even lower percentage of blacks eligible to serve as judges. *Nipper*, 1 F.3d at 1181, n. 13. The *Nipper* holding, however, is limited to the Voting Rights Act context and did not address the Fourteenth Amendment analysis. The Supreme Court, on the other hand, has defined the relevant statistical pool for analysis under the Fourteenth Amendment. When a particular task or job requires special qualifi-

.cations, the relevant statistical pool is the number of minorities qualified to undertake the particular task or perform that particular job. *E.g., Croson*, 488 U.S. at 501–02, 109 S.Ct. at 725–26 (citing *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977)); *Johnson*, 480 U.S. at 651–52, 107 S.Ct. at 1462 (O'Connor, J., concurring). *Nipper* does not reach or overrule these cases.

The job of a judge requires special qualifications. Indeed, these qualifications are set forth by law. Thus, in keeping with the holdings of the Supreme Court, the relevant statistical pool for analysis of this case under the Fourteenth Amendment is the percentage of blacks qualified to serve as judge. Since that exact number is not available, the Court has utilized the best approximation available—the percentage of black members of the Georgia Bar.[37] This liberal percentage clearly gives the benefit of the doubt to the Proponents. Thus, the provisions in question are based on a mistaken belief of what constitutes the relevant population in an equal protection case—the relationship between the proposed remedy and the relevant population is, therefore, improper.

Additionally, these provisions are based on a purely speculative notion that given a world free from all prejudice, the percentage of black judges would approximate the percentage of blacks in the general population. Perhaps Justice O'Connor said it best in holding that the 30% quota in *Croson* was not narrowly tailored: "It is based upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Croson*, 488 U.S. at 507, 109 S.Ct. at 729 (citing *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 494, 106 S.Ct. 3019, 3059, 92 L.Ed.2d 344 (1986) (O'Connor, J., concurring in part and dissenting in part) ("[I]t is completely unrealistic to assume that individuals of one race will gravitate with mathematical exactitude to each employer or

---

**36.** While there is some dispute as to the exact numbers presently, the 1980 Census shows that blacks compose of 26.8% of the Georgia population. (Proponents' Exhibit 12.) In any event, the percentage is less than 30%.

**37.** This percentage is also inexact. However, all of the Parties agree that the range is between two and four percent.

union absent unlawful discrimination")). There is no evidence presently before the Court to make that assumption any less unrealistic.[38]

### e. The Effect of the Remedy on Innocent Third Parties

The provisions in question impose significant and unreasonable burdens on innocent third parties. The cases indicate that a government may constitutionally require non-minorities "to share the burden of remedying past discrimination." *Peightal*, 940 F.2d at 1410 (citing *Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2778). Yet, plans that call for layoffs on account of race, *see, e.g., Wygant*, 476 U.S. at 282, 106 S.Ct. at 1851, or that impose absolute bars on non-minority hiring, *see, e.g., Paradise*, 480 U.S. at 184, 107 S.Ct. at 1073, are less likely to survive strict scrutiny.

The thirty judge minimum provision establishes hard and fast numerical minimum requirements. There are currently one hundred fifty-nine (159) superior court seats approved by the Georgia General Assembly, of which one hundred forty-five (145) are filled and fourteen (14) are frozen by Court Order. If this consent decree were approved, the fourteen frozen seats would become available. There are currently ten (10) black superior court judges. Thus, if the consent decree were approved, fifteen black judges would have to be appointed to the superior court bench before the end of 1994. Since there would be only fourteen positions available and the State would be obliged to appoint fifteen black judges, non-black candidates would be all but precluded from competing for any superior court judgeship through the end of 1994.[39]

The state assignment judgeship provision is also questionable under this inquiry. The provision restricts appointments to minority lawyers and is not limited in number. It is this type of unyielding and absolute racial preference that the courts have frowned upon. Moreover, this provision must be viewed in light of the entire consent decree as a provision designed to assist the State in meeting the thirty judge minimum requirement. Thus, the impropriety associated with the thirty judge minimum requirement must be imputed to this provision as well—neither provision stands alone. Thus, the provisions in question impose unyielding and unreasonable restrictions on non-black qualified potential candidates, a fact that illustrates that these provisions are not narrowly tailored.

### f. The Availability of Waiver Provisions

The provisions in question do not have waiver provisions or their equivalent. Waiver provisions indicate a type of flexibility in a plan. For instance, a plan that sets forth an apparently strict quota, may nevertheless be permissible if the strict requirements can yield under certain circumstances—if exceptions can be made. *See generally, Croson*, 488 U.S. 469, 109 S.Ct. 706. The essence of this inquiry, therefore, is whether exceptions can be made within the provisions in question.

As indicated *supra*, the thirty judge minimum requirement is in the form of a strict quota. Even though the provision does not exclude the possibility of non-black judicial appointments, current circumstances dictate that not many of these exceptions would be possible if the State hopes to meet its December 31, 1994, deadline.[40] Thus, the improbability of exceptions and the lack of set criteria for such exceptions, indicates that the provision is not narrowly tailored.

The state assignment judgeship provision applies only to "minority lawyers." While the term "minority lawyers" on its face in-

---

**38.** Indeed, the Voting Rights Act itself also expressly disapproves of this notion: "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973.

**39.** The Proponents argue that not all the judges appointed before the end of 1994 would have to be black because the legislature could enact additional judgeships, and the consent decree allows for the appointment of state assignment superior court judges to help meet the numerical requirements. Even so, while the thirty judge minimum requirement does not create an absolute bar to appointment of non-black candidates, reality dictates that all or nearly all judges appointed prior to the end of 1994 would have to be black to satisfy the numerical requirements of this provision.

**40.** *See, supra*, Section VI.D.2.e.

cludes non-black minorities, that is clearly not the intent of the provision. This provision is intended to assist the State in meeting the thirty judge minimum requirement—thirty black judge minimum requirement. Thus, while exceptions are possible on the face of this provision, reality again dictates otherwise.

### g. Conclusion

■ The thirty judge minimum requirement and the state assignment judgeship provision are not "narrowly tailored" to achieve the State's compelling interest. These provisions act together to set out quota-like numerical requirements that lack the sort of flexibility and limitations necessary to pass muster under an equal protection analysis. The provisions in question were designed with a misconceived notion of proportional judicial representation and therefore fail to precisely relate to the relevant pool of individuals who have suffered from the State's discriminatory history. Moreover, these provisions, and thus the consent decree as a whole, impose unreasonable and constitutionally impermissible burdens on innocent third persons. Society needs diversity and States need to address and eradicate the effects of past discrimination, but equal protection must be complied with in the process. The provision in question are not narrowly tailored to achieve a compelling state interest and therefore violate the Equal Protection Clause of the Fourteenth Amendment. Accordingly, the consent decree cannot be approved.

This holding is inconsistent with the Department of Justice's preclearance of the changes contemplated by the consent decree. However, the Department of Justice's preclearance was based on the representation of the Georgia Attorney General that there is authority under state law for the Governor and the Attorney General to implement the voting changes embodied in the consent decree and despite the express concern that some of the provisions of the consent decree might violate *Croson.* As discussed *supra,* the Attorney General does not have authority to settle a case, where the entitlement terms violate both state law and the United States Constitution. Thus, the Department of Jus-

tice's determination was based on incorrect legal conclusions. The inconsistency between the Court's conclusion and the Department of Justice's preclearance is now explained.

### Conclusion

■ There has been no determination to date, and none was possible during the evaluation of the consent decree, that the current Georgia judicial election system violates Section 2 of the Voting Rights Act or the Federal Constitution. Absent such a finding, it would be wholly inappropriate, and indeed an abuse of this Court's power, to force a change upon Georgia's citizens, particularly a change that would clearly reduce their rights to select public officials of their choice through the mechanism they developed and ratified in their Constitution. Under these circumstances, the Court must defer to the system enacted by the people of this State.

Additionally, the Court finds that certain provisions contained in the consent decree would violate Georgia statutory and constitutional law. A retention election system, such as the one set forth in the consent decree, cannot satisfy the present Georgia constitutional requirement that judges be elected. Furthermore, the consent decree would impermissibly alter the delicate political power structure embodied in the Georgia judicial election system. In these and other ways, the consent decree would, through the coercive and injunctive powers of this Court as opposed to the normal legislative and political processes, effectively amend the 1983 Georgia Constitution and nullify present Georgia statutory law. The Court cannot allow its power to be used in that fashion under these circumstances.

Furthermore, the Court concludes, after careful analysis and thought, that certain of the settlement provisions would violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Specifically, the Court finds that the thirty judge minimum requirement and the state assignment superior court judgeship provision are not narrowly tailored to achieve a compelling state interest.

In light of these conclusions, the Court cannot say that the consent decree sets forth a settlement that is "fair, adequate, reasonable and legal" under the "totality of circumstances." Accordingly, the Court hereby REJECTS the consent decree, and the Proponents' motion for approval of the consent decree is hereby DENIED. The Intervenors' motion for summary judgment is obviated by the above holding and their motion is, therefore, DENIED.

Nothing in this Order should be construed as a determination of the merits of this case under Section 2 of the VRA, and nothing should be read to prohibit the State, through its legislature or otherwise, from enacting a constitutionally permissible plan.

SO ORDERED.

### Exhibit A

Tyrone Brooks, et al., Plaintiffs,

v.

State Board of Elections, et al., Defendants.

### CONSENT DECREE

This matter comes before the Court for judicial approval of a settlement entered into between the parties in the above captioned case.

### A. *Introduction*

*Brooks v. Georgia State Board of Elections,* [775 F.Supp. 1470] Civ. No. CV288–146 (S.D.Ga.) (hereinafter *"Brooks* I") was filed on July 13, 1988, alleging violations of Sections 2 and 5 of the Voting Rights Act, 42 U.S.C. § 1971, *et seq.,* as well as the First, Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the United States, in the manner in which the State of Georgia elects its superior court judges.

*Brooks v. Miller,* Civ. No. 1:90–CV–1001 RCF (N.D.Ga.) (hereinafter *"Brooks* II"), was filed on May 8, 1990, alleging that the use of a majority vote requirement for federal, state, and county elections in Georgia, O.C.G.A. § 21–2–501, was in violation of Section 2 and the First, Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the United States.

The courts have jurisdiction of the above described actions pursuant to 42 U.S.C. §§ 1971(d), 1973j(f) and 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

### B. *Parties*

#### 1. *Brooks I*

The plaintiffs in *Brooks I* are twenty-two (22) black citizens and voters from throughout the State of Georgia. They allege that the use of at-large, numbered post elections for superior court judges, using a majority vote requirement, violates both Sections 2 and 5 of the Voting Rights Act. They also challenge the manner in which certain judicial circuits are drawn. Further, they allege that the State of Georgia has illegally implemented numerous statutes creating additional superior court judgeships, without first obtaining preclearance from the United States Department of Justice or the United States District Court for the District of Columbia. Since the filing of the complaint, plaintiffs have broadened their challenge to include the statewide method of electing appellate court judges, *i.e.,* the judges of the court of appeals and supreme court, and the at-large method of electing state court judges.

Defendants are the Secretary of State and the Georgia Board of Elections, who are charged with the responsibility for supervising the conduct of elections for judges of the superior court in the various circuits throughout the state.

#### 2. *Brooks II*

The plaintiffs in *Brooks II* are twenty-seven (27) black citizens and voters throughout Georgia, and include the plaintiffs in *Brooks I.* They allege that the statewide majority vote requirement was adopted in 1964 with a racially discriminatory purpose, and that it has a discriminatory result in violation of Section 2 and the Constitution.

Defendants are the Governor, the Georgia Board of Elections, the Secretary of State, and the Constitutional Officers Election Board, who have the duty of administering and implementing the statewide majority

vote requirement, and the DeKalb County, Georgia Board of Elections, and the Superintendent of Elections of DeKalb County, who were sued on their own behalf and as representatives of a class consisting of other boards and entities in Georgia which administer and implement the statewide majority vote requirement in their respective counties.

## C. *Course of Relevant Proceedings to Date*

### 1. *Brooks I*

Between 1964 and 1988, Georgia enacted 80 statutes regarding the election of superior court judges. All told, seventy-seven judgeships and five new circuits were created. The judgeships and new circuits were implemented by the state shortly after enactment.

On June 27, 1988 the State submitted these statutes to the Attorney General for preclearance. By letter of August 26, 1988 the Attorney General notified the State he did not object to thirty one of the proposed changes, and requested additional information regarding the remaining changes. The State elected instead to litigate the question of Section 5 coverage in the *Brooks I* court rather than complete the administrative submission. Because that submission was not completed, the Attorney General objected to the remaining pending statutes on June 16, 1989, at which time none of the additional requested information had been submitted.

On May 16, 1989, plaintiffs filed a motion for preliminary injunction, seeking to enjoin any further implementation of these unprecleared statutes. By order of December 1, 1989, the court gave defendants thirty (30) days within which to submit the information requested by the Attorney General and ordered that no further appointments or elections could be made as to 48 judgeships until preclearance was obtained. *Brooks v. Georgia State Board of Elections,* 775 F.Supp. 1470, 1482–83 (S.D.Ga.1989).

The State of Georgia provided the requested information to the Attorney General within the time frame set by the court. On April 25, 1990, the Attorney General entered an objection on the merits to all 48 judgeships, finding that the state had not carried its

burden of proving that the changes had neither a discriminatory purpose nor discriminatory effect. A copy of that objection letter is a part of the stipulated evidence in the record in these cases.

By order of May 29, 1990, as amended on June 25, 1990, the court provided that incumbent judges could continue to hold office until the preclearance question was finally resolved in the United States District Court for the District of Columbia, but continued the ban against appointment or election as to those judgeships which had not yet been precleared. The orders of the court finding that the disputed voting practices were covered by Section 5, and implementing a remedy, were affirmed by the Supreme Court. *Brook v. Georgia State Board of Elections* [498 U.S. 916], 111 S.Ct. 288 [112 L.Ed.2d 243] (1990), and *Georgia State Board of Elections v. Brooks* [498 U.S. 916], 111 S.Ct. 288 [112 L.Ed.2d 243] (1990). Although a declaratory judgment action was filed by the state in the U.S. District Court for the District of Columbia, *Georgia v. Barr,* C.A. No. 90–2065 (D.D.C.), no preclearance has been obtained as of this date as to a total of 62 judgeships.

No proceedings have yet been held as to plaintiffs' claims under Section 2 of the Voting Rights Act.

### 2. *Brooks II*

The statewide majority vote requirement provides in relevant part that "no candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office." O.C.G.A. § 21–2–501. The statute applies to all federal, state, and county elections, except the general election for Governor, in which a majority vote requirement is separately provided for by Ga.Laws 1968, pp. 977 and 1562. A majority vote requirement is also in effect for municipal elections by virtue of Ga.Laws 1968, p. 885, O.C.G.A. § 21–3–407, except for those municipalities whose charters provide otherwise. The plaintiffs in *Brooks II* did not challenge the majority vote requirement for municipal elections, nor did they challenge the use of a majority vote requirement

pursuant to a court ordered or court approved district election plan adopted subsequent to the enactment of the state wide majority vote rule.

Plaintiffs filed a motion for a preliminary injunction against further use of the majority vote requirement on May 31, 1990, on the ground that the requirement was adopted with a racially discriminatory purpose and had a racially discriminatory effect in violation of Section 2. After conducting an evidentiary hearing July 9–14, 1990, the court denied the motion on July 17, 1990. The court denied injunctive relief, *inter alia*, on the ground that "such relief would not be in the public interest at this point in the election cycle." (Order at 14)

On July 17, 1990, the court entered an order certifying the case as a class action on behalf of all present and future black registered voters of Georgia. On November 14, 1990, the court entered a further order with the consent of plaintiffs dismissing the DeKalb County defendants based upon the stipulation by the state defendants that they would enforce any outstanding order of the court that awarded plaintiffs relief, not only in the election of statewide officers but also in the election of county offices affected by the majority vote requirement. Dismissal of those local defendants was without prejudice to their being added later and with plaintiffs reserving the right to move for defendants' class certification in that event.

On August 9, 1990, the United States filed a similar challenge to the statewide majority vote requirement, *United States v. Georgia*, Civ. No. 1:90–CV–1749 (N.D.Ga.). The defendants were essentially identical in both cases, except that the State of Georgia was named as a defendant in *United States v. Georgia, supra*, and not in *Brooks II*. The Dekalb County defendants have also been retained in the United States' case, and those defendants have become representatives of a class of local defendants.

The United States requested an injunction against further use of the majority vote requirement in those jurisdictions where the majority vote requirement produces discrimi-

natory results or where, absent discriminatory results, no legitimate non-racial overriding governmental purpose exists for the continued use of the requirement. Upon motion of the plaintiffs in *Brooks II*, the two majority vote cases were consolidated by order of the court on December 21, 1990. A proposed pretrial order was filed by the parties in the consolidated cases on February 28, 1992, but the court has not entered a pretrial order as of this date.

On July 16, 1992, upon joint motion of the parties in *Brooks II*, which was unopposed by the United States, the court entered an order designating the Honorable Anthony A. Alaimo, Senior Judge for the U.S. District Court for the Southern District of Georgia, to serve as a mediator to mediate toward a successful settlement of the judicial selection and majority vote cases.

D. *The Course of Settlement Dealings Between the Parties.*

On many occasions, the *Brooks* plaintiffs and representatives of the State of Georgia have met to discuss the possibility of settling the claims asserted in these cases. Those discussions become particularly earnest at the time of the 1990 session of the General Assembly. However, notwithstanding the extended good faith efforts of the parties in search of possible settlements, it was not until 1992 that the parties' efforts yielded an agreement that could be the basis of resolving their disputes. As a practical matter, the success of the settlement discussions in 1992 coincided with the efforts of the Honorable Anthony A. Alaimo to serve as a mediator between the parties. Under Judge Alaimo's guidance and direction, the *Brooks* plaintiffs' representatives met with the representatives of the State on a number of occasions from April, 1992 to June, 1992, when all concerned explored a variety of possible ways of resolving the parties' claims, defenses and legitimate interests. An agreement was ultimately reached between the *Brooks* plaintiffs and the State on June 17, 1992, and the terms of their agreement is reflected in the June 17, 1992 Settlement Memorandum of Michael J. Bowers and Laughlin McDonald to the Honorable Anthony A. Alaimo, which has been

signed by Attorney General Bowers and Governor Miller on behalf of the State, and by Laughlin McDonald, Tyrone Brooks and others on behalf of the plaintiffs. This agreement is part of the stipulated evidence before the court.

As set forth in that Settlement Memorandum, the settlement itself is contingent upon the United States' approval and concurrence with the settlement regarding both the method of electing Georgia's judges and disposition of the majority vote claims. Pursuant to the June 17, 1992 Settlement Memorandum and the *Brooks II* court's official designation of Judge Alaimo as a mediator in the majority vote cases, further negotiations took place between the United States and the State of Georgia. Those negotiations produced a final Agreement on July 29, 1992 between those parties that was signed by Attorney General Bowers on behalf of the State of Georgia and by John R. Dunne, Assistant Attorney General, Civil Rights Division, Department of Justice, for the United States of America. That Agreement provides terms for the resolution of the claims between the United States and the State of Georgia. It, too, is part of the stipulated evidence before the court.

E. *The Terms of Settlement.*

By entering into this Consent Decree, defendants make no admission of liability and specifically deny plaintiffs' allegations and claims. At the same time, the defendants and plaintiffs acknowledge that, in their respective opinions based on the advice of their counsel, neither party is certain of prevailing on any particular claim or defense in this action. The parties hereto are desirous of ending the lawsuits pending between them, and other lawsuits between the State of Georgia, its officers, and the United States (to which the *Brooks* plaintiffs are not parties). To that end, all of the parties hereto have agreed to resolve the *Brooks I* and *Brooks II* class actions on the following terms and conditions.

1. The complaint in *Brooks I* is hereby amended to allege that the use of at-large, numbered-post elections for appellate court judges, those of the Court of Appeals and the Supreme Court, and for state court judges, using a majority vote requirement, violates Section 2 of the Voting Rights Act.

2. By December 31, 1994, there will be a total of no fewer than 25 black superior court judges serving, which would be a total derived from (1) those serving in existing seats, (2) those serving in enacted but unfilled (frozen) seats, (3) persons appointed to the State Assignment Judgeships, and (4) persons appointed to newly enacted seats in existing circuits prior to December 31, 1994. In addition, by December 31, 1994, five other black persons will be appointed to either state or superior court seats in addition to the number serving as of June 17, 1992.

3. Superior court, state court, and appellate court judges will be subject only to "retention" elections after this order takes effect. That is, any judge who seeks an additional term for the same judicial office will be retained in office by vote of the electorate. The retention election will be nonpartisan, will be held at the time of the regular general election, and will require the affirmative vote of a majority of those voting on the question to retain the judge. The question submitted to the electorate will be substantially in the following form: "Shall _____ be retained as [justice] [judge] of the _____ court for _____ years? _____ yes _____ no."

4. Future appointments to the superior courts shall serve no less than two years prior to standing for a retention election.

5. The present Judicial Nominating Commission (JNC) will be increased by two persons, to serve until December 31, 1994, one of whom will be one of the attorneys for the plaintiffs, and the other of whom will be chosen by the Governor from a list of four names that the plaintiffs will give to the Governor. These names may include the plaintiffs.

6. The Governor and the JNC will be responsible for affirmative outreach to fill existing and upcoming vacancies and the JNC will assist in the implementation of this agreement.

7. In the event any vacancies occur by virtue of a "no vote" in a retention election held prior to December 31, 1994, or in the first retention election for any judge appointed pursuant to Paragraph E(2) of this Order, the then-existing JNC, but augmented pursuant to Paragraph E(5) of this Order, will be responsible for making recommendations to the Governor for the filling of those vacancies.

8. A special category of superior court judges will be created known as State Assignment Superior Court Judgeships, and this category of judges shall exist for a period not to exceed 10 years. Qualified minority lawyers will be appointed as such judges by the Governor, upon review and recommendation by the JNC. State assignment judges will be authorized to serve, by assignment, in any circuit in the state.

9. Gubernatorial appointment will be limited to JNC recommendations until such time as the court's jurisdiction terminates pursuant to Paragraph E(16) of this Order.

10. A new executive order shall be promulgated concerning the JNC, its functions, objectives, and composition, after January 1, 1995, and those portions of that order that are germane to the resolution of the issues in this case shall be adopted and made an order of the court in *Brooks I*, such order to terminate when the Jurisdiction of this court terminates under Paragraph E(16) of this Order. If the parties are unable to agree on the terms of such an order, these differences shall be resolved by the Honorable Anthony A. Alaimo pursuant to Paragraph E(13) of this Order. In the event that the State Bar of Georgia is appointed an ex-officio member of the JNC, then the President of the Georgia Alliance of African–American Attorneys shall be appointed ex officio to the JNC.

11. Subsequent to January 1, 1995, the Judicial Nominating Commission shall make recommendations for the superior, state and appellate courts to the Governor without regard to race, color or ethnic origin and the members thereof shall be specifically prohibited from discriminating on the basis of race in making said recommendations.

12. Subsequent to January 1, 1995, the Governor of the State of Georgia shall make his/her appointments to the superior, state, and appellate courts without regard to race, color or ethnic origin and he/she shall be prohibited from discriminating in appointments on the basis of race.

13. The Honorable Anthony A. Alaimo shall serve as an arbitrator of disputes concerning the enforcement of this order, until jurisdiction is terminated pursuant to Paragraph E(16) of this order, and in the event of the inability of Judge Alaimo to so serve, the court shall appoint a successor or substitute to Judge Alaimo. Judge Alaimo shall specifically have the authority to oversee the actions of the JNC and the Governor with regard to the appointment of judges under the terms of the order, and he shall be empowered with regard to those appointments occurring on or after January 1, 1995 to review the recommendations and appointments of the JNC and the Governor to ensure that said actions have been made without discrimination on the basis of race, color or ethnic origin. The specific right of the plaintiffs to challenge the actions of the JNC or of the Governor hereunder does not contemplate the right to "second guess" individual appointments, but rather the right of the plaintiffs to challenge the actions of the JNC or the Governor because of a pattern of appointing white applicants over equally or more qualified black applicants.

14. There shall be no residency requirement for appointment to the superior court bench other than residency within the circuit at the time of taking office and the existing requirement prescribed by law concerning residency within the State of Georgia.

15. The goal of the State of Georgia is a diverse judiciary reflective of the population of the State as a whole.

16. The jurisdiction of the court in *Brooks I* shall terminate upon the State achieving a racially diverse appellate, superior and state court bench which shall be reasonably representative of the population of the State as a whole considering among other factors the percentage of African–American attorneys eligible to serve as judges. The State may petition the court for an end to its

jurisdiction at any time it deems it has complied with this paragraph.

17. A class action on behalf of all present and future black voters in the State of Georgia has already been certified in both *Brooks I* and *Brooks II.*

18. The plaintiffs' claims in *Brooks I* are hereby dismissed with prejudice. This dismissal, however, does not preclude the plaintiffs from making claims under Section 2 to the system of nominations, appointments, and retention elections that are established pursuant to this Consent Decree. No such challenge, however, may be brought before all judges appointed on or before December 31, 1994 have gone through at least one retention election.

19. This consent decree is conditioned upon approval of a consent decree in *Brooks II* incorporating the terms of the settlement agreement between the parties that relate to the majority vote issues. Specifically, that would include the dismissal of the complaint in *Brooks II* with prejudice, provided that such dismissal would not include the plaintiffs' claim involving use of a majority vote requirement for all offices that are elected state-wide, which claim would remain pending upon entry of said decree. That remaining claim, however, would also be deemed dismissed with prejudice unless plaintiffs file a written demand for trial no sooner than December 31, 1994 and no later than June 15, 1995.

20. This Consent Decree is further conditioned upon the entry of a judgment of dismissal with prejudice of the complaint that has been brought by the United States for the Northern District of Georgia involving its challenge to the use of the majority vote requirement in Georgia; provided, however, said dismissal with prejudice shall not include the United States' claims involving use of the majority vote requirement for all offices elected state-wide and for all offices elected at-large on a countywide basis. Those additional claims, however, would also be deemed dismissed with prejudice unless the United States files a written demand for

trial no sooner than December 31, 1994 and no later than June 15, 1995.

21. Upon notification by the parties that the conditions specified in the foregoing paragraphs 19 and 20 have been satisfied, the court will enter an appropriate order making this consent decree the final judgment of the court.

So this ___ day of _____, 1994.

_____

UNITED STATES DISTRICT JUDGE

CONSENTED TO:

/s/ <u>M. Laughlin McDonald</u>

M. Laughlin McDonald

Counsel for plaintiffs

ACLU Foundation, Inc.

44 Forsyth Street, N.W.

Suite 202

Atlanta, Georgia 30303

404/523–2721

MICHAEL J. BOWERS

Attorney General of the State of Georgia

Georgia Bar No. 071650

CAROL ATHA COSGROVE

Senior Assistant Attorney General

Georgia Bar No. 189150

132 State Judicial Building

Atlanta, Georgia 30334

404/656–2647

WALBERT & HERMANN

/s/ <u>David F. Walbert</u>

David F. Walbert

Georgia Bar No. 730450

100 Peachtree Street

Suite 1010

Atlanta, Georgia 30303

404/523–5000

Attorneys for State Defendants